Matthews, Appellant, *v.* Pittsburgh.

Argued October 8, 1958. Before JONES, C. J., BELL, MUSMANNO, JONES and COHEN, JJ.

*Paul J. McArdle,* with him *James P. McArdle,* and *Frank J. Kernan,* for plaintiff, appellant.

*Joseph F. Weis, Jr.,* with him *Russell J. Butler, Jr.,* and *Weis & Weis,* for additional defendants, appellees.

*Thomas E. Barton,* Assistant City Solicitor, with him *J. Frank McKenna, Jr.,* City Solicitor, for defendant, City of Pittsburgh, appellee.

OPINION BY MR. JUSTICE MUSMANNO, November 25, 1958:

On February 14, 1948, John William Matthews fell through a cellar door which formed part of the sidewalk in front of the premises at 5137 Penn Avenue, in Pittsburgh. He brought a suit in trespass against the City of Pittsburgh charging it with negligence in failing properly to inspect the premises and to correct an obviously dangerous condition, averring that the offending door was in a state of disrepair long enough for the City to have had constructive notice of it. The City brought in the property owners, Leonard Hilleson and Henry Hilleson, as additional defendants. The jury returned a verdict for $30,000 in favor of the plaintiff against the defendant and over against the additional defendants. The City and the property owner filed motions for judgment n.o.v. and new trial. The lower Court refused judgment n.o.v., but ordered a new trial. The plaintiff appealed.

Matthews established at the trial that the culprit door was one of two doors (we will call them eastern and western) which overlay a coal bin. The western door sagged 1½ inches at the point it joined with the eastern door. Thus, one walking eastwardly could see that the eastern door rose 1½ inches above its partner, but one proceeding westwardly would be ignorant of the unevenness of the juncture until he reached it or passed over it. On the morning of the accident, Matthews, employed as a milkman by the Otto Milk Company, was walking westwardly on Penn Avenue carrying an empty milk case and a "leaker."* He traversed the eastern door safely, but as he stepped on the western door, he vanished into the coal bin below—milk

---

* We are informed by the record that a "leaker" is a leaking milk bottle.

case, "leaker," and all. A passerby, John Scott, with others, helped him out of the coal hole and then examined the door which had given way like the platform of a gallows. He found that the hinge at one end was rusted away and that the other hinge was missing a pin; also that the crossbar supposed to hold the two doors together "was in bad shape." "The one part that fits in the concrete was rusted out underneath."

John Scott turned out to be one of those rare witnesses that lawyers dream about. He not only arrived at the scene of the mishap an instant after it occurred and thus could describe the condition of the tortious agency, but he had crossed over this very spot some four or five months before and had at that time noted the defects which were still existent when the milkman fell. Scott had even offered at that time to repair the defects since he was a tradesman doing that type of work. The owners did not accept his offer.

A Mrs. Beatrice F. Hartzell was also a strong witness for the plaintiff. She had worked at Brent's, the store located in the building before which the cellar doors gaped, from the latter part of 1946 to February, 1948, and thus had firsthand knowledge of the condition of the cellar doors, which she described as "rickety" and "too loose." She said that as she passed over them they would bounce, jar, sag, and "clang." In time she got the feeling that she would fall with them, and thereafter prudently avoided them. She testified further that children jumped on the doors, leaving them "rattling."

Another witness, Mrs. Ruth McIntyre, was also employed at Brent's and saw Matthews vanish into coal dust. She testified: "Mr. Matthews was walking down Penn Avenue and I was by the window and the next thing he was gone." She also examined the coal hole

and testified that the door was either "hanging down in" or had dropped with the milkman. Like Mrs. Hartzell, Mrs. McIntyre had been familiar with the doors for a long time, since she had been employed at Brent's since May, 1946. She said "they were always bad," that they did not set in an iron rim but rested loosely on the pavement, that people tripped over the doors, that she had heard many complaints about them, and that when she, herself, weighing 110 pounds, stepped on one of the doors, it sagged beneath her.

There can be no doubt that the jury was justified, on the evidence presented, in finding that the sidewalk hazard in front of 5137 Penn Avenue was a conspicuous one and that the City of Pittsburgh, with the passage of time, should have become aware of its existence. Nor can there be any doubt about the danger which lurks in an insecure cellar door. An unsafe cellar door is a potential scaffold. If it does not plunge the innocent and unsuspecting passerby to his death, it may cripple him for life. An insecure cellar door is as dangerous as a faulty bridge, as perilous as thin ice, as hazardous as a leaky gas pipe, and as ominous as an over-pressured steam boiler. When a condition in a sidewalk degenerates into an ambush to imperil pedestrians, and the ambush is directly brought to the attention of a municipality's officials, employees, or agents, or, because of its patency and the period of time it exists, it should have become known to them, the municipality is liable in damage to such persons as are injured by it. The lower Court recognized this immutable principle, and accordingly refused the motion for judgment n.o.v. However, it granted a new trial on the basis that it failed adequately to instruct the jury on all facets of constructive notice.

It is true that the Trial Judge's charge left something to be desired in the respect noted, and we would

not recommend it for repetition. However, considering all the circumstances in the case we do not believe that the error committed was a reversible one. The defective condition charged by the plaintiff, if it existed at all, could only have been an observable one. Mrs. Ruth McIntyre, who, as we have indicated, worked at Brent's for almost two years prior to the accident, testified: "Q. Now was anything done from 1946 through 1946 toward repairing that door, or making those doors even; was there any change? A. Not that I can remember. Q. Not that you can remember. Now, did those doors come to your attention very frequently? A. Oh, yes. Q. And what would call them to your attention; will you tell us that? A. People tripping over them and the noise from the kids coming down from school. . . . Now, did anybody ever come in and say anything to you when you were in the store about the doors? A. Yes. People that come in the store. Q. What was that? A. Well, when I had customers and when they would fall over the doors, trip over it, they would come in and mention it to me. I recall one time a lady made me come out and look at it. . . . Q. You have already told us that the door would sink down when you walked over it. What about any noise that it would make? A. Oh, it made a lot of noise. Q. Did it make a noise unusual for a cellar door? A. Oh, yes."

And then there is the testimony of John Scott that in the early part of the fall of 1947 he saw the defect in the doors as he was walking over the sidewalk: "Q. And you say you could see? A. That is right. Q. Where could you see? Where was the opening? A. Down into the well-hole."

The order of the court below granting a new trial to the city must be reversed. Nor is there justification for awarding a new trial to the property owners. The Trial Judge charged the jury that "constructive notice

means that in the exercise of ordinary vigilance and care the City should have known about the condition by reason of the time that it existed." Since the jury found that there was a defective condition and that it had existed for a sufficient length of time to give notice to the City, it could not avoid finding that the property owners also knew or should have known of the condition since they had purchased the property over four months prior to the accident and one of the owners testified that he actually inspected the doors at the time of the purchase. In addition, he said that he visited the property once a month and had occasion to step on the doors on two occasions. Although this property owner said he found the doors in good repair he is charged, in view of the finding of the jury, with knowledge that the doors were actually in a state of disrepair. Thus, if the hazard was one which put the city on constructive notice, it inevitably was one which put the property owners on notice.

The additional defendants, pointing to the fact that they purchased the property but four months before the accident, argue that the Trial Judge should have particularly instructed the jury on whether they thus had had sufficient opportunity to discover and correct declared defects. The Trial Judge did cover this aspect of the case. "Now, of course, a property owner must have some notice. For instance, assuming that the doors were defective on this particular occasion, if that defect just immediately occurred—for instance, if the condition of a broken door existed just immediately before the occurrence of this accident—then the property owner would not, of course, in such circumstances have liability there where we will say that somebody did something to that door; that is, either in the ordinary use of it or by some vandalism or some accident that happened to the doors where no negli-

gence would be thrust upon the owner; that is, where something happened to them, then the owner of course would not be charged with negligence until he has a reasonable time to fix them by reasonable observation and examination of the equipment."

Both the city defendant and the property owners also argued in the Court below for a new trial on the grounds that the verdict was against the weight of the evidence and that the verdict was excessive. We are satisfied that the record does not support either of these contentions. The Court was justified in finding that the amount of the verdict was not excessive. (*Bochar v. Martin Motors, Inc.*, 374 Pa. 240.)

The order of the Court below is reversed and the verdicts as rendered are reinstated.

Mr. Justice BENJAMIN R. JONES concurs in the result.