Rice *v.* Philadelphia Transportation Company,
Appellant.

Argued November 13, 1958. Before JONES, C. J., BELL, MUSMANNO, JONES and COHEN, JJ.

*Harry A. Takiff*, for appellant.

*Martin J. Vigderman,* with him *Freedman, Landy* and *Lorry,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 12, 1959:

Charles Rice, the plaintiff in this case, was injured when his automobile was struck by a street car of the defendant Philadelphia Transportation Company. The jury returned a verdict of $20,000, and the defendant company moved for judgment n.o.v., charging contributory negligence. It also moved in the alternative for a new trial on the ground of excessive verdict. The lower court refused both motions and the defendant appealed.

Reading the record through the eyes of the jury, which resolved all contradictions, doubts, and ambiguities in favor of the plaintiff, the following narrative of fact is authorized. On September 8, 1955, Charles Rice got into his automobile which was parked on the east side of Third Street in Philadelphia and moved out into that thoroughfare, intending to travel in a northward direction. Before leaving the curb he looked in both directions and noted a street car in a stationary position about 150 feet distant, south of Pine Street which intersects Third Street. This one-way highway accommodates three lanes of travel, the middle one occupied by a car track. Heavy automobile traffic was moving north on the west side of the street and many automobiles were parked on the east side. The lane open for Rice was the street car track. The approach from his parked position to the street car lane was one which required Rice to make a wide turn. As he reached the first rail of the car track, he indicated with his hand that he was making a right turn, having already displayed his mechanical signal to the same effect. At this point the street car was still stopped

below Pine Street taking on and discharging passengers. Thus reassured that he was in no danger from the street car, he moved ahead cautiously—at about one mile per hour.

When his left front wheel reached the outer (or western rail), the street car started forward with an immediate acceleration to 25 miles per hour and continued at that speed with no deceleration at any time. Rice saw himself trapped. He could not go forward because of the heavy auto traffic in the western lane and he could not back up into his former parking space because of the congestion behind him. He stopped dead, hoping and assuming that the motorman would see his plight and allow him time to extricate himself. The street car, however, relentlessly advanced and crashed into the left front of his automobile. When Rice expostulated to the motorman, the latter replied: "I am sorry, fellow, when I saw you it was too late."

It is argued by the defendant company on this appeal that the plaintiff was guilty of contributory negligence in that he voluntarily placed himself in a position of danger. The danger in which the plaintiff placed himself was one every motorist faces when he takes his automobile into street car tracks, but it is a danger of no consequence if motormen observe, as they are required to do, the traffic ahead and have their cars under control. While street cars have a superior right to the use of their tracks, that right is not an exclusive one. They must share it with motorists who also, of course, must observe the safety rules of the highway. But these rules do not require the motorist to do what is superfluous and what is unreasonable. With a street car stopped at least 150 feet away, Rice did not go beyond the bounds of prudence in assuming that he could straighten out his automobile on the car track before the street car could complete its

operation of discharging and receiving passengers; nor did he do violence to the code of reasonableness, binding on every motorist as well as motorman, for believing that, under the circumstances, the street car would not collidingly overtake him.

The appellant contends that because of the moving traffic in the left lane, Rice should have waited until that traffic abated or, since there was no abatement, he should have retreated to the parking spot from which he had emerged. Neither action was called for, or, in fact, feasible. To have waited until the traffic in the left lane abated might have meant waiting all day. And, to have backed up to the parking spot, with the left traffic lane moving, the street car advancing, and the right lane filled with parked cars would have required a deftness and engineering skill which might have taxed the combined ingenuity of a surveyor's team and a helicopter crew. The law does not require a motorist to exercise any such genius to extricate himself from a trap caused by a motorman's flagrant negligence.

And then, it is a question whether an attempt on the part of Rice to retreat, in the face of the seething traffic at that moment, might not have accentuated rather than diminished the danger to all concerned. The able and learned Trial Judge well said in this connection: "Whether it was reasonable for him to stay on the tracks, waiting to get in the far line or to straighten out on the track; whether he should have backed into the place he had vacated, and whether, if he had altered his angle of approach, he would have had to manoeuvre hardily to get back in again—these were obvious issues for the jury."

A similar state of affairs occurred in the case of *Natvig v. P. R. T.*, 293 Pa. 355. There, the plaintiff moved out from a parked position when the involved street car was 150 feet away. She signalled her inten-

tion to enter the street car tracks. Later, when the car was 100 feet distant, she signalled again. The motorman did not stop moving and crashed into her automobile. In sustaining the ensuing verdict, this Court said through Justice (later Chief Justice) KEP-HART: "When the woman held out her hand and the trolley car was 100 feet away, the motorman had ample notice of the fact that she intended to use a portion of the space on which the trolley car must move. This notice came from the fact that her car, in backing, was near the tracks,—in itself a warning—and from the signal given by her. The motorman should have governed himself accordingly . . . The accident could be likened to a rear-end collision where the oncoming trolley or vehicle had ample opportunity to see the object ahead and stop or slacken its speed."

To find Rice guilty of contributory negligence as a question of law, would be to say that he should have waited in his parking place until all traffic on Third Street had ceased which would have been many hours later and it would be to say that when a motorist sees a trolley car anywhere on the streetscape he must remain frozen to his present spot until the trolley disappears. Of course, the law never said that and does not say it today. In *McClintock v. Pittsburgh Rwys. Co.*, 371 Pa. 540, we approved what was said in *Shannon v. P. R. T.*, 115 Pa. Superior Ct. 494, by the Superior Court: "The mere sight of a trolley car in the distance does not prevent the driver from attempting to cross if such distance would appear to afford the opportunity to the ordinary prudent person . . . It was for the jury to decide as to whether he exercised the reasonable care required under the circumstances. There is no doubt, taking as we must, that his narration is true, the jury could find that there was ample time for the motorman to stop his car when he saw the plaintiff on the track."

In *High v. Reading Transit Co.*, 97 Pa. Superior Ct. 477, the plaintiff's car was struck by a street car when it moved out from its parking place. The Court approved of the lower court's language in refusing judgment n.o.v.: "He had to swing his car far enough out into the street to enable him to clear the car ahead; that is, he had to proceed at an angle from the curb . . . He had a right to assume that others using the street would use due caution in accordance with the circumstances to avoid injury to him. He was not bound to anticipate the defendant's trolley car would approach at a reckless speed . . . or that it would not be operated with due care."

At the time of the collision the plaintiff complained to the motorman: "What's the matter, didn't you see my signal? I was sitting on the track." From this the appellant argues: "One who, knowing that a streetcar is approaching, voluntarily leaves his vehicle standing on the track when there is no reason, mechanical or otherwise, requiring him to do so, is guilty of contributory negligence as a matter of law."

But Rice, by his use of the word "sitting", did not mean he remained on the track long. The posture of sitting does not necessarily mean the consumption of a long period of time. The word is purely relative. One who sits on a hot stove would surely not sit for more than the fraction of a second. The defendant contends that, based on a mathematical computation made by counsel from the testimony of various witnesses as to distances, speeds, and locale, the plaintiff was "sitting" on Third Street for 30 seconds.* But all these computations are vague, shadowy figures which melt completely

---

* The defendant attempts here to invoke the incontrovertible physical facts rule but that rule is not applicable when it depends on oral evidence as to position, movement, or speed of moving objects. *McGavern v. Pittsburgh Railways Company*, 378 Pa. 13.

under the strong light of the plaintiff's definitive testimony (accepted by the jury) that he was motionlessly on the tracks for only four seconds before the crash occurred. Thus, in that flash of deliberation as to what Rice thought was best to do in order to save himself from the disaster only an instant away, the street car had accomplished the catastrophe. The defendant suggests that Rice could have left his automobile when he saw the car would not stop, but if he had attempted such a movement in that lightning moment of hoping for self-preservation he might have invited not only more serious injuries but quite possibly death. In any event, whether any of plaintiff's action constituted contributory negligence was strictly a question for the jury.

We affirm the lower court's refusal of judgment n.o.v.

The appellant has moved for a new trial on the ground of excessive verdict. As the result of the accident, the plaintiff suffered an injury to his back which was first diagnosed as an acute but which later developed into a chronic lumbosacral sprain. Thirty minutes after the accident the plaintiff felt shooting pains in both legs which sensation was followed by a numbness and weakness in the extremities. His family doctor strapped his back, prescribed medication and put him to bed. Two days later he entered the Pennsylvania Hospital where he was placed in pelvic traction, described by Dr. Jacob Krause as an "application of a girdle or a corset about the waist level, and on each side are attached ropes with weights that put traction or stress along the waist section of the body."

The plaintiff was hospitalized for five days and he then returned home where he remained in bed for several days more under the care of his family physician, receiving heat treatment about three times a week. On

October 1, 1955, he returned as an out-patient to the hospital and was instructed on how to apply further heat treatment and how to use bed boards for his back condition. The treatments apparently gave him relief but he found that when he walked for a couple of blocks or attempted any heavy lifting the pain in his back became so intense that he would need to stop to rest.

The plaintiff is a longshoreman by trade. This is an occupation which requires more muscular exertion than any other occupation except possibly the strong man at a circus who lifts staggeringly weighted dumbbells above his head. But whereas the circus man performs his feat two or three times a day, the longshoreman must accomplish it continuously. His job is to load and unload ships with cargoes ranging from baby carriages to pianos, steel bars, and iron safes. While mechanical devices and cranes assist in the loading and unloading processes of ocean-going liners, basically what carries most of the cargo to and from decks is the longshoreman's back. And if his back is weak he becomes as useless as a blacksmith with scrawny biceps or the proverbial one-armed paper hanger. A longshoreman with a weak back is of no more use on a busy pier than a wheelbarrow without the wheel.

Dr. Krause demonstrated to the jury, by means of a skeleton, the damage which had been done to the plaintiff's bony, ligamentous and muscular structure. The doctor testified that the plaintiff suffered "tears, sprains, partial tears, and hemorrhage of the soft tissues supporting the lower lumbar and lumbosacral portion of the spine, the zone taking the greatest part of the stress of our back."

As a result of this damage "There was a mechanical inadequacy in this portion of the man's back, inadequacy in the sense that when stress of either repeated nature or undue force for short periods was exerted,

these tissues and structures simply could not take the load."

When Dr. Krause was asked what effect this anatomical disrepair would have on the plaintiff's "ability to do stevedore work, carrying and discharging heavy cargo," he replied: "Well, I think I can best answer that, Mr. Fine, by stating that this man, first of all, should not medically be permitted to do work which involves repeated bending even for light objects or for lifting at all. He certainly should do no work which requires the lifting of weighted objects. He should not do work which involves pushing or pulling of weighted objects; and I would certainly advise him to refrain from doing activities which require him to work on steep stairways or ladders, because again that is a stress, producing a rocking motion on that back and it will cause increased pain. Medically, this man, by continuing with such activities, is merely endangering his own life activity span, plus the fact that this thing can break down under such unprotected circumstances to an even more severe or vicious situation."

With the type of back injury described by Dr. Krause, it is obvious that as a longshoreman, Rice's outlook on life is a bleak one. A longshoreman's back is to him what a gangplank is to a ship. As passengers and freight pass over the gangplank to fill the ship, so do all things, which a longshoreman needs to live, pass over his back. A longshoreman's back holds up his whole economic world as Atlas's shoulders sustained the earth.

In considering damages in a personal injuries lawsuit, the monetary award must be based on the utilitarian value of the affected area of the body according to the importance that area bears to the whole map of economic effort. To a sedentary professional, a weak back might mean only the loss of his golf game, but to

a longshoreman a weak back could mean the collapse of the ramp over which his wife and children climb to reach the plateau of wholesome living to which they are entitled.

When Rice returned to the waterfront with his injured back he was like a warrior returned to the battlefield with a broken sword. His comrades shielded and helped him. Sympathetically they let him take all the light jobs available, such as hooking and unhooking cables on winches, an activity which requires no bending, lifting, or pulling. As a consequence he earned $5500 in 1956 as against only $2,000 in 1955. Of course, his total wages in 1955 were diminished because of his inability to work for four months. Even so, the larger amount earned in 1956 is no criterion as to earning power. In *Bochar v. J. B. Martin Motors, Inc.*, 374 Pa. 240, 244-5, we said: "A tortfeasor is not entitled to a reduction in his financial responsibility because, through fortuitous circumstances or unusual application on the part of the injured person, the wages of the injured person following the accident are as high or even higher than they were prior to the accident. Parity of wages may show lack of impairment of earning power if it confirms other physical data that the injured person has completely recovered from his injuries. Standing alone, however, parity of wages is inconclusive. The office worker, who loses a leg has obviously had his earning ability impaired even though he can still sit at a desk and punch a comptometer as vigorously as before. It is not the status of the immediate present which determines capacity for remunerative employment. Where permanent injury is involved, the whole span of life must be considered. Has the economic horizon of the disabled person been shortened because of the injuries sustained as the result of the tortfeasor's negligence? That is the test. And it is no answer to

that test to say that there are just as many dollars in the patient's pay envelope now as prior to his accident. The normal status of a healthy person is to progress, and to the extent that his progress has been curtailed, he has suffered a loss which is properly computable in damages."

Aside from this rationalization, however, the verdict of the jury in this case is justified for a stronger reason. We have seen how in 1956, Mr. Rice's fellow-longshoremen stepped aside to let their disabled brother enjoy the easier jobs. In 1957 a new system went into effect on the waterfront, a rotation system whereby one took his turn at the jobs, heavy or light, as they happened along. Since, in longshoreman's work, the heavy job is the rule and the light one a rare exception, Rice fell on evil days. Among the toiling ants he was the one on whom a blundering foot had stepped with crushing effect. Thus he was shunted aside. Employers would not take a longshoreman with a pliable back when there were many with vertebrae of steel from which to choose. In consequence, as of the trial in October, 1957, Rice had not earned any wages since April of that year. With regard to impairment of earning power the Trial Judge charged the jury: "What kind of person is he? You have seen him. He doesn't seem to be a person of college education. If he were, a great field of light work would be open to him, but it isn't because of whatever his education has been. He has done longshore work, apparently, all his life. What does that fit him for if he is unable to do the hard work that is associated with it?"

The jury had no trouble in reading Rice's life horizon. They saw it was a cloudy and inauspicious one, offering little hope for adequately remunerative work. They thus read in it a grave diminution in earning power. They also saw many days of pain when Rice

should attempt to exert himself in the effort he would need to make to support himself and family. The jury accordingly returned a verdict of $20,000 which is not excessive when one views, as the jury did, the entire physical and economic panorama of the plaintiff's disabled existence.

The defendant company introduced no medical evidence to contradict the plaintiff's evidence as to his physical condition. Defendant's counsel's only argument against the evidence was that the plaintiff's doctor testified for an hour or, as he put it, he "lectured" for an hour. But if there was anything insupportable in the doctor's testimony, the longer he talked, the greater would have been the opportunity on the part of the defendant to find some flaw, inconsistency or contradiction in that testimony which the defendant could have refuted with other medical testimony. The defendant, however, not only introduced no refuting medical testimony but, with the exception of one remark about the X-ray films, defendant's counsel had no objection whatever to offer to the doctor's testimony.

The verdict was a just one according to law, and the judgment entered thereon is accordingly affirmed.

Mr. Justice Bok took no part in the consideration or decision of this case.