Philadelphia *v.* Philadelphia Transportation Company, Appellant.

316

Argued April 27, 1960.   Before Jones, C. J., Bell, Musmanno, Jones, Cohen and Eagen, JJ.

reargument refused July 1, 1960.

*Philip Price,* with him *R. B. Kunkel, James Conwell Welsh,* and *Barnes, Dechert, Price, Myers & Rhoads,* for appellant.

*Morris L. Rush,* with him *I. Raymond Kremer,* and *Rush and Kremer,* for appellees.

*Matthew W. Bullock, Jr.,* Assistant City Solicitor, with him *Anthony Ryan,* Assistant City Solicitor, *Joseph Furlong,* Deputy City Solicitor, and *David Berger,* City Solicitor, for City of Philadelphia, appellee.

OPINION BY MR. JUSTICE MUSMANNO, June 3, 1960:

While pursuing a stolen automobile over the streets of Philadelphia, firing shots in an endeavor to stop the escaping car, Police Officer Joseph P. Echeverria smashed into a bus of the Philadelphia Transportation Company which had moved into his path despite audible and visual warnings of the police-robber chase. Echeverria sustained serious injuries.

The policeman and the City of Philadelphia sued the Philadelphia Transportation Company and were re-

spectively awarded verdicts by the jury in the sum of $10,000 and $6,830.20, the latter for damages done to the police car ($1,129.45), hospital expenses incurred in behalf of Echeverria ($1,819.75), and disability benefits paid to Echeverria ($3,881).

The defendant bus company has appealed seeking judgment n.o.v., or, in the alternative, a new trial. It is the contention of the appellant that the collision between the bus and the police car occurred because of the reckless driving of Echeverria himself. Reading the testimony in the light most favorable to the verdict-winners, as is required in an appellate review of the denial of a judgment n.o.v., the following facts emerge from the record. On Sunday afternoon, September 9, 1956, while patrolling the streets in a police car in the vicinity of Fisher's Lane and Ramona Street, Echeverria saw a Chevrolet car bearing a license plate whose number he had heard that morning as being that of a stolen car. He immediately started toward the suspected Chevrolet whose driver, after a glance at the red police car, conspicuously carrying POLICE signs, stepped heavily on the gasoline pedal and dashed away. Echeverria took up pursuit, shouting into his radio microphone: "Emergency, 3508 in pursuit of stolen automobile."

An Emergency Patrol Car (#3500), armed with siren and red flashing light signals, answered the call and at once joined in the chase, following Echeverria at a distance of some 300 feet, its audible and visual signals working continuously. After various twists and turns over various streets, Echeverria and the Emergency Patrol Car got on to Adams Street following the stolen car which was heading eastwardly. When Echeverria came to a point about a half block away from where Kensington Avenue (which runs north and south) bisects Adams Avenue, the stolen car was al-

ready racing through the intersection against a red light.

To his right on Kensington Avenue, Echeverria noted a bus, its front (pointing northwardly) projecting into the intersection some four or five feet from the Adams Street south houseline. During the entire pursuit Echeverria had been blowing the horn of his car, and the Emergency Patrol wagon in his wake had been sounding its siren continuously. As a consequence, all traffic in and close to the Adams-Kensington intersection (with the exception of the stolen car) was at a standstill. As Echeverria neared the intersection, somewhat slackening his speed here, the bus moved forward into his path, and the collision occurred.

Section 1014(b) of The Vehicle Code (75 PS §573(b)) reads, inter alia: "The driver of a vehicle upon a highway shall yield the right of way to police . . . vehicles . . . when such vehicles are operated upon official business and the drivers thereof sound audible signal."

Section 1015 (75 PS §574) provides: "(a) Upon the approach of any police . . . vehicle . . . answering fire or emergency calls, giving audible signal, the driver of every other vehicle shall immediately drive the same to a position as near as possible, and parallel to, the right-hand edge or curb of the highway, clear of any intersections of highways, and shall stop and remain in such position, unless otherwise directed by a peace offficer, until such vehicle shall have passed."

The defendant contends that Echeverria came to grief because of his own recklessness and that thus, being guilty of contributory negligence, he may not recover. In its brief the appellant says: "This is not a case in which a police officer undertook to exercise his right to run through a red light at a street intersection and as he was doing so some one else ran into him.

On the contrary it was he that ran into a bus, that must have been clearly visible to him if he had looked, after he had slowed down for the intersection when he saw that the traffic light was red against him."

Echeverria does not deny that he saw the bus. Responsibility for this accident does not depend on who saw whom or what. It depends on whether all parties concerned obeyed the law applicable to the given emergency. Even aside from the statute quoted above, there rests on all persons the obvious duty to do nothing which may interfere with policemen and firemen as they go about their duties protecting the public.

The driver of the defendant bus, Edward Kaminski, could not help but know that a serious police operation was in progress when he started from a stopped position and moved into the middle of the intersection. He had already seen a car, as he testified, "dart right across" in front of him, travelling at about 50 miles per hour. This car, which defied the red light, was undoubtedly the escaping stolen car. He then saw or certainly should have seen Echeverria's car, which was a brilliant red beacon in the afternoon sun, the lettering POLICE appearing conspicuously on the front grille and on the sides of the car. And then the Emergency Patrol Car, in spectacular color and also emblazoned with POLICE signs, had been sounding its siren throughout the chase.

The defendant attempts to distinguish between the sounds made by the Echeverria car, which had no siren, and the Emergency Patrol Car which had a siren. Directing attention to Section 1015(a) of The Vehicle Code, the defendant says in its brief: "It is at once apparent that the language of this section requires construction. Not only is 'audible' not defined but the word 'signal' is used and not merely the word 'sound.'"

We see no reason for constructing or defining so simple a word as "audible." The word audible is di-

rected to the recipient of the phenomenon of sound rather than to the maker of it. Thus the question here is not only what did the police do, but whether what they did was of such a character that it could reasonably have been communicated to Kaminski, the driver of the bus. Was the sounding of the horn on Echeverria's car and the blasting of the siren on the Emergency Patrol Car of such noise-making intensity that Kaminski heard or, if reasonably alert, should have heard it? One who does not want to hear or is completely absorbed in dreamy abstraction might fail to hear even the roar of a cannon or the pounding of a wild sea against a rocky shore. Thus, whether the signals produced by Echeverria's horn and the Emergency Car's siren registered on Kaminski, or should have registered on him if he had been alert, was a question of fact for the jury, and they concluded that Kaminski heard or should have heard the audible signals.

Kaminski's movement forward, in the face of the police emergency communicated to him through the senses of sight and hearing, constituted in itself a case of negligence which would make the bus company responsible in damages to the injured parties.

On this state of facts, as found by the jury, Echeverria's action could not be declared contributory negligence as a matter of law. In *Reilly v. Philadelphia*, 328 Pa. 563, 567, this Court said that The Vehicle Code "specifically exempts from the ordinary traffic rules and regulations police, fire and hospital vehicles when engaged upon offcial emergency duties. Private automobiles and trucks are required to give way to such vehicles [section 1015 (a)] and they themselves while acting in emergencies are exempt from the restrictions as to speed [section 1002 (f)], right of way [section 1014 (b)], traffic signals [section 1026 (d)] and through 'stop' highways [section 1016 (d)]. The gen-

eral restriction imposed upon the operators of such vehicles is merely that they may not drive in 'reckless disregard of the safety of others.' "

Whether, in spite of these immunities, Echeverria acted in "reckless disregard of the safety of others," was a question of fact for the jury which found he was not reckless. The record supports this finding.

As already stated, the jury returned a verdict of $10,000 in favor of Echeverria. The defendant contends that the verdict is not justified by the record. On this subject the lower court said: "Following the collision Echeverria was taken to the Frankford Hospital where he remained for four days. During this time he experienced severe pain and was given frequent injections. His injuries were diagnosed as a comminuted fracture of the left femur (described by one of the medical witnesses as a 'smash fracture') together with multiple lacerations and contusions. On September 13, 1956, Echeverria was removed to the Philadelphia General Hospital where he underwent several operations on his left leg. He was discharged from the Philadelphia General Hospital on January 25, 1957, and used crutches until May, 1957, when he commenced walking with a cane. He returned to work on the Philadelphia Police Force but his wound was still draining and he was not able to resume his regular duties until August, 1957.

"As a result of the accident Echeverria has a permanent scar on his left thigh which is twelve inches long and one and one-half inches wide. He has a permanent shortening of three-quarters of an inch of the left leg and is required to wear a lift in his left shoe. He testified that he is still not able to perform his duties as formerly in that he cannot run as well as he could prior to the accident and he can no longer engage in athletics or hunt as he formerly did. At the time of the trial officer Echeverria was thirty years of age.

"Dr. John Joseph Dowling, Jr., a well qualified orthopedic surgeon, testified that he treated Echeverria for a comminuted fracture of the left femur, together with multiple lacerations and contusions. He confirmed the serious nature of the injuries sustained and at trial he measured Echeverria's legs and testified that the left leg was three-quarters of an inch shorter than the right one.

"It is difficult to conceive of any case in which the item of pain and suffering and future pain and suffering more clearly belongs than this one."

The defendant argues that there was no evidence of diminution in earning power. Echeverria testified: "Q. Are you able to perform your police duties at the present time as well as you did formerly, prior to the accident? A. No, sir. Q. Why not? A. For one thing, they won't let me work on an emergency wagon because if I was to attempt to lift somebody, my leg bothers me and I have been off for three or four days. Q. Any other reason? A. Well, I just cannot run."

A policeman who is unable to move rapidly on his feet certainly has had his earning power impaired. The defendant points out that the plaintiff received an increase in salary since the accident, but this, of itself, is not conclusive proof of extent of earning power. In *Bochar v. J. B. Martin Motors, Inc.,* 374 Pa. 240, 244, we said: "It is not the status of the immediate present which determines capacity for remunerative employment. Where permanent injury is involved, the whole span of life must be considered. Has the economic horizon of the disabled person been shortened because of the injuries sustained as the result of the tortfeasor's negligence? That is the test. And it is no answer to that test to say that there are just as many dollars in the patient's pay envelope now as prior to his accident. The normal status of a healthy person is to progress, and to the extent that his progress has been curtailed,

he has suffered a loss which is properly computable in damages."

In *Stark v. Lehigh Foundries, Inc.*, 388 Pa. 1, 23, this Court said: "The Court is not warranted in setting aside, reducing, or modifying verdicts for personal injuries unless unfairness, mistake, partiality, prejudice, or corruption is shown, or the damages appear to be grossly exorbitant. The verdict must be clearly and immoderately excessive to justify the granting of a new trial. The amount must not only be greater than that which the Court would have awarded, but so excessive as to offend the conscience and judgment of the Court."

There is no such excessiveness in this case.

Judgments affirmed.

---

DISSENTING OPINION BY MR. JUSTICE BELL:

An examination of the position of all three cars and of all the facts, some of which the majority opinion has inadvertently overlooked, demonstrates that judgment should be entered for defendant non obstante veredicto.

Mr. Justice BENJAMIN R. JONES joins in this dissenting opinion.