**Mary K. GREGORY and Donald J. Gregory, Jr., Plaintiffs,**

v.

**SOUTH HILLS MOVERS, INC., Defendant.**

**Civ. A. No. 78–1193.**

United States District Court, W. D. Pennsylvania.

Aug. 27, 1979.

---

Dennis C. Harrington, Pittsburgh, Pa., for plaintiffs.

Herman C. Kimpel, Pittsburgh, Pa., for defendant.

## OPINION

MARSH, District Judge.

The plaintiffs in this diversity case are citizens of Ohio and the defendant is a corporate citizen of Pennsylvania. The accident occurred in Allegheny County, Pennsylvania, and this action is subject to the provisions of the Pennsylvania No-Fault Motor Vehicle Insurance Act, Act of July 19, 1974, P.L. 489, No. 176 (40 P.S. § 1009.-101 et seq.).

The case was tried in May 1979 by able and experienced counsel on each side. The jury returned a verdict in favor of Mary K. Gregory, the wife plaintiff, in the amount of $15,000 for pain, suffering, inconvenience, and disfigurement of her left knee, and in favor of Donald J. Gregory, Jr., the husband plaintiff, in the amount of $6,000 for loss of consortium.

Dissatisfied with the amount of the verdicts, the plaintiffs seek a new trial and urge as grounds that:

(1)(2) The verdict was against the applicable law, the evidence and the weight of the evidence.

(3) The court erred in failing to sustain plaintiffs' objections to certain portions of the testimony of the defendant's medical witness, Dr. Norman Minde.

(4) The court erred in refusing plaintiffs' motion to strike certain portions of the testimony of Dr. Minde.

(5) The court erred in refusing to charge the jury on wife plaintiff's impairment of earning power as an element of damages in the case.

(6) The court erred in allowing defendant to reopen defendant's case and call the husband plaintiff for the purpose of establishing payment of medical and hospital bills relating to wife plaintiff's injuries.

(7) The court erred in allowing defendant to introduce evidence that medical and hospital bills had been paid in spite of the fact that the court had resolved that problem at the preliminary pretrial conference when it was determined that the plaintiffs would not offer their medical bills in evidence as exhibits.

(8) The court erred in refusing plaintiffs' motion for withdrawal of a juror after defendant's counsel deliberately injected the term "no-fault insurance" into a question propounded to husband plaintiff concerning the payment of hospital and medical expenses.

(9) The court interrupted the closing remarks of plaintiff's counsel to the jury so as to create an embarrassing and harmful situation and thereby limited the closing remarks in such a way as to make plaintiffs' counsel's closing ineffectual to the prejudice of the plaintiffs.

Each of the grounds has been considered. In our opinion the motion for a new trial should be denied.

### (1)(2) Adequacy of the Verdicts

On November 26, 1976, the wife plaintiff was a passenger in the rear seat of an automobile stopped at a red light on State Route 51, a four-lane highway. A tractor-trailer driven by an employee of the defendant collided with the rear of the automobile.

The plaintiffs alleged that the driver of the tractor-trailer was negligent. The defendant denied negligence and invoked the doctrine of sudden emergency alleging that the tractor-trailer had suddenly lost its braking power.

After the accident the wife plaintiff complained of pain in her head, neck and ribs. She was referred to Dr. Maley, an orthopedist, for aches in her head, neck and back; at that time she had no complaint about her knee. She complained to Dr. Myers of pain in her shins. Not until January 3, 1977 did she tell Dr. Myers about the accident on November 26, 1976. On May 2, 1977, she first complained to Dr. Myers of pain in her left knee.

On a foundation of circumstantial and opinion evidence, the defendant contended that the wife plaintiff's knee condition was not caused by the November 1976 accident.

It appears that in May 1978 the wife plaintiff was confined in a hospital for knee surgery and resulting therapy. She claims she cannot do all the normal household activities which she did before her knee started to hurt; that she had to give up bowling and outdoor activities such as camping.

After surgery she walked with crutches and a walker for a period. At the time of trial she walked with a cane except in the house. Surgical scars on her knee were shown to the jury in photographs.

Insofar as the award to the wife plaintiff consists of pain, suffering, inconvenience and disfigurement, it is obviously nothing that a trial court can measure and decide whether the jury has awarded too much or too little; such items have no market value. No special damages (i. e., loss of wages, hospital or medical expenses, past or future) were submitted to the jury.

There was a serious conflict in the evidence as to whether or not a torn medial meniscus and chondromalacia in the wife plaintiff's left knee were caused by the accident since pain did not localize in her left knee until around May 1977.[1] Likewise, the evidence of the extent of the disability in her knee and its likely duration were in serious conflict. On cross-examination the defendant's doctor stated: "I feel this woman can get a complete recovery." [Dr. Minde's Testimony, p. 47.] The plaintiffs' doctor, Dr. Krieg, opined she would have a permanent 20%—25% disability in her knee. Thus the dollar amount of compensation for the effects of the knee injury including loss of consortium were matters peculiarly for the jury.[2]

Although the court might have come to different conclusions, trial judges are not free to reweigh evidence and set aside a jury verdict merely because the jury could have drawn different inferences or conclusions. *Tennant v. Peoria & P. V. Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1964); *Reiner v. Banker's Security Corp.*, 305 F.2d 189, 193 (3rd Cir. 1962). "—[T]he continuing concern of the courts of the United States [is] that in the federal forum the constitutional right to jury trial [should] not be eroded by judicial intrusions upon the province of the jury—", *Rumsey v. Great Atlantic and Pacific Tea Company,*

---

1. See letter of Dr. Myers dated February 12, 1979, attached to plaintiff's pretrial statement. Dr. Myers deposition, p. 12.

2. Loss of consortium is a proper item of non-economic detriment. *Zagari v. Gralka,* —— Pa. Super. ——, 399 A.2d 755 (1979).

408 F.2d 89, 91 (3rd Cir. 1969). Cf. *Lind v. Schenley Industries, Inc.*, 278 F.2d 79, 91 (3rd Cir. 1960). In weighing the evidence on damages, in our judgment the verdicts were rational; no clear manifestation that the jury reached seriously erroneous results is perceived, or that its verdicts were arbitrary or the result of caprice, prejudice or improper motive. The damages do not appear to be grossly inadequate; they do not offend the conscience and judgment of the court. No clear case of injustice appears. *Takac v. Bamford*, 370 Pa. 389, 395, 88 A.2d 86 (1952).

■ In the more frequent cases where excessiveness is alleged, courts in general are reluctant to disturb a jury's verdict on the grounds of excessiveness where the damages are unliquidated and there is no fixed measure of mathematical certainty. *Armit v. Loveland*, 115 F.2d 308, 314 (3rd Cir. 1940). The same rule applies "where a new trial is sought on the theory of inadequate verdict." *Wooley v. Great Atlantic & Pacific Tea Company*, 281 F.2d 78, 80 (3rd Cir. 1960).

### (3)(4) Objections to Dr. Minde's Testimony and Motions to Strike

Dr. Minde, a specialist in the field of occupational medicine and rehabilitation, was called by the defendant as an expert witness. He testified the plaintiffs came to his office on April 20, 1979, that he took the wife plaintiff's history, examined her, found her to be overweight, X-rayed her knee, expected her to improve further although an overweight condition usually prolongs recovery. He testified that he was familiar with torn cartilage sustained by athletes, and that most of those he treated and had surgery returned to their professional athletic endeavors. Included was the doctor's remark:

> "One of the most famous that have had knee surgery following this type of injury was a baseball player who was known by everyone, Mickey Mantle, and he continued to play baseball, following this surgery, on a number of occasions."

Plaintiffs' counsel moved this testimony be stricken "unless this doctor can testify that he treated Mickey Mantle and identify, from his own experience, the same type of injury that Mrs. Gregory had with that of Mickey Mantle." The motion was denied.

■ The specific grounds of the plaintiffs' obligations and the motion to strike Dr. Minde's testimony do not affect a substantial right of the plaintiffs. Fed.Rule of Evidence 103(a). If error, at most the doctor's testimony about professional athletes and his remark concerning Mickey Mantle were cumulative to direct evidence of his personal treatment of athletes and the ability of most of them to resume their athletic pursuits after surgery.

■ An expert medical witness may testify regarding the probabilities of recovery from the effects of an injury, provided the consequences anticipated may reasonably be expected to happen and are not merely speculative or possible.

■ The questions objected to by plaintiffs were proper to qualify Dr. Minde with regard to knee injuries and eliminate speculation. His volunteered remark with respect to Mickey Mantle was certainly neutralized by his testimony of personally treating athletes for knee injuries and that most had recovered from surgery and resumed playing baseball and football. Expert medical witnesses are entitled to emphasize their qualifications and opinions with illustrations to explain the bases of their opinions and we think mentioning Mickey Mantle, if error, was harmless. Fed.R.Civ.P. Rule 61. If there was any harm in that reference, it was surely neutralized by the exhaustive five page cross-examination about the doctor's lack of personal knowledge of Mickey Mantle's knee injuries. [Minde Testimony, pp. 40–45.]

■ Under Rule of Evidence 703 an expert witness is authorized to base his opinion upon non-admissible data if he, as an expert, would reasonably rely upon such data in reaching conclusions in his field of expertise, here, rehabilitation. We think Dr. Minde could reasonably rely upon pro-

fessional discussions based upon published accounts of Mickey Mantle's knee injuries, subsequent surgery and resumption of athletic activity. Cf. *United States v. Williams*, 447 F.2d 1285 (5th Cir. 1971).

### The Hypothetical Question

▮ Plaintiffs' counsel objected to a hypothetical question put to Dr. Minde. The objection was overruled. [Minde Testimony, pp. 18–20.] A subsequent motion to strike was denied. [Id. pp. 22–23.] The question included all the admitted material facts in evidence relevant to the formation of a medical opinion as to whether or not the accident caused the knee injury. Dr. Minde said he had an opinion and stated it. The doctor's opinion based on the relevant facts contained in the question and evidence was to the effect that the accident of November 26, 1976, did not cause the knee injury since it did not become evident to the wife plaintiff for at least a month thereafter.[3] Even if the rulings were in error, in view of the verdicts in favor of the plaintiffs, their substantial rights were not injuriously affected, Rule of Evidence 103(a), and were harmless. Fed.R.Civ.P. Rule 61.

### (5) Earning Power

The plaintiffs assume that loss of earning power may be recoverable under Pennsylvania's No-Fault Motor Vehicle Insurance Act as non-economic detriment. See 40 P.S. § 1009.301(a)(5). No authority was cited at trial. The defendant in its brief received on June 11, 1979, cited *Zagari v. Gralka*, —— Pa.Super. ——, 399 A.2d 755 (1979) which does not decide the issue. However, defendant contends there was no proof of loss of earning power by the wife plaintiff. We agree with defendant.

There was no attempt to show that the wife plaintiff had any past earnings or that she had ever engaged in or considered engaging in gainful employment. There was no indication that, but for her injuries, she would have sought employment after the accident nor was there any indication that she desires to be or will be employed in the future. There was evidence that she could perform some but not all of the household chores which she had performed before her knee started to hurt. In this respect the jury was instructed with regard to her husband's loss of his wife's services. "We believe, that under the particular circumstances, that was as far as the court could go." *Gottlob v. Hillegas*, 195 Pa.Super. 453 at 461, 171 A.2d 868 at 872–873 (1961).

Furthermore, there was no proof as to the value of the housework the wife plaintiff performed before her knee became partially disabled. Not only was there no proof that she ever had been a wage earner but there was no proof that she had been trained in any money-earning profession or other wage earning employment or possessed any financial talents.

▮ Proof of age, health, habits and life expectancy of the wife plaintiff may be competent in such cases, but standing alone, such proof does not afford a sufficient basis on which to rest a verdict for loss of earning power.

As stated in *Zimmerman v. Weinroth*, 272 Pa. 537, at 540, 116 A. 510, at 511 (1922):

> "The loss of earning power and its amount must appear by proper and satisfactory proof and not be left to mere conjecture."

See also *Gottlob v. Hillegas*, supra; *Carroll v. Pittsburgh Railways Company*, 200 Pa. Super. 80, 187 A.2d 293 (1962); *Beck v. Baltimore and Ohio Railroad Co.*, 233 Pa. 344, 82 A. 466 (1912); *McKenna v. Citizens' Natural Gas Co.*, 198 Pa. 31, 47 A. 990 (1901).

The loss of earning power, due to partial, temporary or permanent disability of a knee is not always easy to calculate. Of necessity, it requires proof of the value of labor, physical or intellectual, performed by the injured lady before the accident happened to her, and her ability to earn money

---

**3.** According to Dr. Myers, the wife plaintiff's knee complaints started in May 1977, about six months after the accident.

by labor, physical or intellectual, after the injury. There was no such proof in this case.

In all the cases cited by the plaintiffs[4] the injured parties had been gainfully employed before the accident.

### (6)(7) Proof that Medical Expenses Were Paid

The No-Fault Motor Vehicle Insurance Act, supra, posed an important procedural problem for the Court, i. e., whether the jury should be advised by proof or otherwise that the wife plaintiff's extensive medical expenses had been paid.[5] At the pretrial conference held on February 8, 1979, at page 11, plaintiffs' counsel stated: "_ _ _ [I]n reference to the medical bills in this case, what we propose at this time is, if the Court sees fit, they be admitted and their total amount be subtracted from any settlement or verdict." No authority was cited.

At the final pretrial conference on May 3, 1979, during discussion off the record, plaintiffs' counsel stated he was not going to offer plaintiffs' medical bills in evidence and the court made it a matter of record. Transcript p. 3. "The Court: The plaintiff is not going to offer plaintiffs' bills in evidence as exhibits. That eliminates the no-fault problem."

During the trial it was emphatically brought out that the wife plaintiff had been attended by several doctors. First she was attended by doctors at the Westmoreland Hospital where she complained of a headache and head, neck and rib injuries. She did not mention any injury to her knee. X-rays were taken at the hospital. Later she was attended by Dr. Edward Maley of Lancaster for examination of her head and neck. On December 22, 1976 she was attended by Dr. Herbert E. Myers in Elizabethtown. No mention was made of her knee. Although she made several visits to Dr. Myers, it was not until January 3, 1977 that she told him of the automobile accident on November 11, 1976. She first complained of pain in her knee to Dr. Myers on May 2, 1977. She also was attended by Dr. Kenneth N. Hehman, M.D., in Cincinnati, Ohio, by Dr. Karoblis, M.D., in Felicity, Ohio, and by Dr. John K. Krieg, M.D., in Cincinnati, Ohio, who operated on her knee on May 9, 1978.

It was brought out that the surgery was performed in the Deaconess Hospital in Cincinnati where she remained for eleven days. Later she was readmitted for knee manipulation and remained in the hospital for five days. Next she was taken by her husband to Brown County Hospital twice a week for six months for therapy treatments. The round trip was 35 miles.

The defendant submitted the following point for charge:

"Point Two. Under the Pennsylvania No-Fault Act, Plaintiffs in this case can only recover for non-economic loss. Thus, their recovery is limited to pain, suffering and inconvenience. *There can be no award for medical expenses as these have already been paid.*"

The court indicated this point was a correct statement of the law with the addition that the husband plaintiff could recover for loss of consortium, but was uncertain whether the jury should be informed that the medical expenses had been paid. On this point strenuous and persuasive arguments pro and con were made by counsel.[6] No citation of authority was submitted.

After the extensive and impressive trial evidence of hospital and multi-doctor

---

4.  *Frankel v. Todd*, 393 F.2d 435 (3d Cir. 1968); *Rice v. P. T. Company*, 394 Pa. 454, 147 A.2d 627 (1959); *Philadelphia v. P. T. Company*, 400 Pa. 315, 162 A.2d 222; *Holton v. Gibson*, 402 Pa. 37, 166 A.2d 4 (1960); *Bochar v. J. B. Martin Motors, Inc.*, 374 Pa. 240, 97 A.2d 813 (1953); *DiChiacchio v. Rockcraft Stone Products Company*, 424 Pa. 77, 225 A.2d 913 (1967); *Corcoran v. McNeal*, 400 Pa. 14, 161 A.2d 367 (1960).

5.  Answers to interrogatories disclosed the total medical expenses to be $5,810.50.

6.  The arguments were made prior to the plaintiffs' rebuttal testimony by Donald J. Gregory but a transcript of the arguments was not ordered by counsel.

services, the resulting unknown medical expenses were bound to intrude upon and impress the minds of some if not all of the jurors. All jurors are conscious that medical expenses are items that must be paid. Thus, the court agreed with the defendant that the jury should be informed that the medical expenses had been paid without mentioning the amounts. Plaintiffs' counsel refused to stipulate to this fact.[7]

Thereupon, at defendant's request, the defendant was permitted to reopen its case and call the husband plaintiff who testified that all the medical expenses had been paid.[8]

In our judgment to have refused plaintiffs' request would have ignored the reality that the extensive trial evidence of hospital and multi-doctor services at the very least would be a source of curiosity for the factfinders and they conceivably might speculate as to the amount of the medical expenses involved and inflate verdicts in favor of plaintiffs unless informed that the medical expenses had been paid and plaintiffs were not seeking reimbursement.

This happens to be the first no-fault case to have been tried in this court. Neither side cited any authority which would have resolved the problem. If subsequently it is decided that justice has been subverted by informing the jury that the wife plaintiff's medical expenses have been paid,[9] we will not hesitate hereafter to keep the matter secret and refuse permission to either side to prove that the medical expenses have been paid and the jury instructed that medical expenses are not to be taken into account in arriving at the amount of damages to which the plaintiffs may be entitled. However, it is our opinion that an informed jury is the more equitable approach. Otherwise, there is a real danger that a jury in returning its award for a plaintiff will add a substantial sum of money to cover the obviously extensive hospital and multidoctor expenses.[10]

(8) Motion for Withdrawal of a Juror

▮ Plaintiffs allege that "defendant's counsel deliberately injected the term 'no-fault insurance' into the question propounded by defendant's counsel to husband plaintiff concerning the payment of hospital and medical expenses." This allegation is not correct. Defendant's counsel asked the husband plaintiff:

"Q. Just one further question, Mr. Gregory. All your wife's medical expenses have been paid under Pennsylvania no fault; have they not?"

The word "insurance" was not included in the question. But since "no fault" was mentioned, plaintiffs' objection was sustained; the jury instructed to disregard the question as it was highly improper. Defendant's counsel then asked the question previously asked in absence of the jury:

"Q. Mr. Gregory, were your wife's medical expenses paid? Have all your wife's medical expenses been paid?

A. Yes." [11]

In our opinion, the motion for withdrawal of a juror was properly refused.

(9) Interruption of Closing Remarks

▮ Counsel for the defendant in his summation consumed fifteen minutes from 11:40 a. m. to 11:55 a. m. Immediately thereafter Mr. Harrington began his summation for plaintiffs. Customarily, the recess for lunch is 12:30 p. m. Without requesting an adjournment or permission to postpone the customary adjournment time, plaintiffs' counsel talked for over an hour during which the issues of negligence, damages for pain, suffering and inconvenience and the medical opinions on each side were

---

7. Transcript "Excerpt of Proceedings During Jury Trial" pp. 2–3.

8. Transcript "Excerpt of Proceedings During Jury Trial" pp. 5, 7.

9. See "Jury Charge" p. 17.

10. Compare approved instructions that any award would not be subject to income taxes and that the jury should not add or subtract taxes in fixing the amount of any award. *Domeracki v. Humble Oil & Refining Co.*, 443 F.2d 1245, 1251 (3rd Cir. 1971).

11. Transcript "Excerpt of Proceedings During Jury Trial" pp. 5–7.

extensively analyzed. Thereupon, the court stated: "Mr. Harrington, you have talked over an hour. I will give you ten more minutes if you need it; then, we will stop it. After all, we would like to go to lunch, you know." [12] Counsel did not object. He did not appear to be embarrassed, and proceeded to finish his summation in about five minutes with a forceful and eloquent argument for damages for loss of consortium. See his closing remarks hereto attached.

In our opinion the interruption was not harmful and did not render counsel's closing remarks ineffectual to the prejudice of the plaintiffs. No language was used by the court which could possibly create resentment or prejudice against plaintiffs. After all, the jury awarded them substantial verdicts despite a strong defense.

Accordingly, the motion for new trial will be denied. An appropriate order will be entered.

12. "Excerpt of Proceeding During Closing by Mr. Harrington" p. 2.