Laurelli *v.* Shapiro, Appellant.

Argued November 17, 1964. Before BELL, C. J.,
MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROB-
ERTS, JJ.

reargument refused Jan-
uary 27, 1965.

310

*James M. Marsh,* with him *Joseph G. Manta,* and *LaBrum and Doak,* for appellant.

*I. Raymond Kremer,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 5, 1965:

On Christmas Day of 1954, Anthony Laurelli, then 50 years of age, was injured when a rescue truck of the City of Philadelphia which he was driving, was struck by an automobile owned by the defendant William Shapiro. The jury returned a money verdict in favor of Laurelli.[1] Laurelli had been previously injured in an accident in 1948, and it is the contention of the defendant, who has here appealed, that whatever may be Laurelli's symptoms of illness or disablement, they are not the result of what happened on December 25, 1954. The plaintiff admits his accident of 1948 but insists that the mishap in 1954 reactivated and aggravated his previously existing ailment. The defendant also claims that the plaintiff's infirmities do not rise to the state of disablement claimed by him.

When the defendant's automobile collided with the city truck being driven by the plaintiff, an oxygen bottle in the truck broke loose from its moorings and hit the plaintiff, his chest then violently came into contact with the steering wheel and the left side of his head struck the door of the truck. He was rendered unconscious and was taken to the Nazareth Hospital but transferred, at his request, to the Philadelphia General Hospital, which maintains a special ward

---

[1] There were other parties in the case but since the appeal is limited to Laurelli's verdict, no point will be served in discussing the other phases of the litigation.

for firemen. He returned to work about a month after the accident, but, because of the constant head pain which assailed him, he was re-hospitalized for treatment. In July, 1955 he was unable to continue at his regular employment in the fire department and the city assigned him to odd light duty jobs, at which he continued until 1958. During this period he received every five days, at the Philadelphia General Hospital, histamine injections. In 1958, the pains had reached such a state of severity that Dr. Olson operated on him in an attempt to give him relief. He described the operation as follows: "We go in through the skull and lift the base of the brain off the floor of the skull and pick up this little tiny nerve and cut it."

This cerebral surgery apparently afforded the patient some relief but in time the pains returned in all their severity and he had again to go into the municipal clinic for treatment and medication. As late as May, 1963, he was hospitalized for ten days and up to the time of the trial (September, 1963), was receiving histamine injections every five days.

Five doctors testified to the plaintiff's condition: Dr. Olsen, surgeon; Dr. Caracciolo, city physician; Dr. Brunetti, Chief Police and Fire Department Surgeon for City of Philadelphia; Dr. Channick, specialist in internal medicine. Dr. Olsen diagnosed the plaintiff's disability as histamine cephalalgia and explained: "Histamine cephalalgia is a name given to a group of symptoms such as Mr. Laurelli describes of recurring episodes of pain involving one side of his face and the lower part of the head, coming frequently at night, wakening the patient from sleep, lasting for an hour or two and subsiding, and during the episodes of pain the patient has flushing of the face on that side, injection of the eye, tearing of the eye, and usually mucous running from his nose."

The plaintiff himself expressed in rather vivid language the pain he underwent the night of the accident: "It got to the roof of your mouth and then it came up to the lip, up to the nose, over the eye, in the middle of the forehead, all around. God, you could almost feel every hair on your head. It was enough to make you commit suicide, for God's sake, terrible. I can't describe it."

The defendant showed that the plaintiff did not enjoy good health prior to 1954, that he had suffered from neuralgia and kindred infirmities. The plaintiff admitted that his life had not been free of physical torment after 1948, but insisted that, in comparison to what he suffered after 1954, his life prior to that was a "picnic."

The defendant's principal argument for a new trial is that the lower court erred in allowing the plaintiff's doctors to testify to the plaintiff's alleged pain. It is the defendant's thesis that it is impossible for a doctor to know whether a patient is in pain or not. Defendant's counsel in his brief categorically declares that there is a "unanimity of view that pain is completely subjective" and that, therefore, the trial court erred in permitting "plaintiff's doctors to testify that plaintiff actually had the pain he complained of and to further testify as to the severity of the alleged pain."

A court cannot prevent a doctor from testifying to his diagnosis of a patient, so long as the testimony is relevant. The doctor may speak what the judge may not believe, but it is not for the judge to gag him. He may, of course, in his charge, tell the jury his estimate of the doctor's testimony but he may not, in the absence of any improperiety, order a doctor not to testify to what the doctor states he found right or wrong with the patient. The doctor may be compelled to give reasons for his estimate of the plaintiff's condi-

tion, but the court has no power to order him not to testify that the patient has suffered pain.

Moreover, there is no authoritative medical work which asserts that pain is wholly and *always* subjective. There is not a doctor who would not declare that a person will suffer pain if he holds his hand over a blazing torch, or loses a finger in a grinding machine, or takes poison which throws him into bodily contortions with accompanying grimaces, cries and twitching, bloodshot eyes. There are very few absolutes in medicine as perhaps there are few, if any, in the law, but the fact *is* that pain can be very objective and it can be detected by persons other than the one who states he feels it. There are symptoms of pain that write their story on one's countenance as clearly as lightning scribbles in the sky its fiery message of nature's discomfiture.

With X-ray machines which reveal what is invisible to the human eye without it, with cardiographs that record the story of the heart locked in the bony vault of the chest, and with stethoscopes that relate the concealed functions of the pulmonary apparatus, it is too much to declare scientifically that a doctor cannot and can never discover pain in others. A patient may speak of a pain that has no basis, he may simulate an anguish which does not exist, he may complain and shed artificial tears, but there are few doctors who, armed with training and experience, cannot, after conducting a sufficient number of examinations, determine what is sham and what is automatic reaction, what is genuine hurt and what is purposely contrived.

Dr. Brunetti, Chief Police and Fire Surgeon, testified that the plaintiff Laurelli "chaffeured" him around to fires, buildings collapses and other emergencies from 1949 to 1952, when he had occasion to note that the plaintiff would complain of pain in his face, and that he observed an augmentation of those

symptoms following the accident of 1954. He said that after December, 1954, Laurelli was in "severe pain, very severe pain," that "he lost weight, and generally he was on the downgrade." He explained that there are some pains that cannot be "faked," and illustrated with the conditions of kidney stone and tic doloreux, stating that "they are characteristic and so agonizing that I do not think anybody could fake a pain of either one of those two conditions."

In any event, it is for the jury to decide whether a doctor, who has testified to pain on the part of the plaintiff, has been deceived. Especially is this true when the plaintiff's doctor is contradicted by the defendant's doctor who gives his reasons why he concludes that the plaintiff was free from the pain testified to by the plaintiff's doctor.

The defendant cites the case of *Littman v. Bell Telephone Co. of Pa.,* 315 Pa. 370, where this Court said that "pain being a subjective phenomenon, only the person who experiences it is competent to testify as to its actuality." But in that case the doctor had said that the plaintiff "suffered 'the pain that he complained of.'" He was thus affirming what he could not know—the degree of pain that the plaintiff said he complained of, but where the doctor bases his conclusion on what he himself sees and discovers, his testimony is competent.

In *Lutz v. Scranton,* 140 Pa. Superior Ct. 139, 145-6, the able Judge STADTFELD, in discussing the *Littman* case said that there, the physician testified that the plaintiff suffered " 'the pain that he complains of,' " but in the *Lutz* case, the physician testified that the plaintiff did suffer pain.

In *Ferne v. Chadderton,* 363 Pa. 191, 199, Justice HORACE STERN (later Chief Justice) approved the reasoning in the *Lutz* case, saying: "There was no error in allowing Dr. Colwell to testify that decedent suf-

fered pain: Lutz v. Scranton, 140 Pa. Superior Ct. 139, 145, 146. Had the doctor doubted the existence of such pain he certainly would not have administered 'repeated shots of morphine.' "

Had Dr. Olsen in this case doubted the existence of the pain described by the plaintiff Laurelli, he certainly would not have drilled a hole in his head, lifted his brain, searched for a tiny nerve and snipped it with the scientific hope that by this cutting he would shut off the agony which was taking the patient in and out of hospitals, away from his work, away from his recreations, away from the pleasures of life he had enjoyed prior to the accident of 1954.

The study of pain is as much a study as the reading of x-rays. Since the doctor's most important function is to relieve pain, temporarily or permanently, it would be to declare the medical profession a complete failure to say that it is impossible for a doctor to discover the very situation he is called in to cure. As an electrician touches and maneuvers wires, arranges switches and performs other tests to discover what has caused a break in the line of illumination and what he has to do to repair the break, so also does the doctor learn by tests, examinations, explorations, auscultation and palpation whether there should or should not be pain in any given area. Even Dr. Ornsteen, testifying for the defendant, admitted that the plaintiff had more pain because of the accident of 1954: "The situation in this case refers to what happened in the form of an accident which placed him in a situation which he was not in before the accident; and to that situation *he reacted with this emotional tension; so he had more pain.*" (Emphasis supplied)

In 15 Am. Jur., Damages, §336, we find this illuminating statement on a physician's capacity to testify to pain: "A physician may testify as to visible symptoms and indications manifesting pain and suffering;

and where the injured person complains of pain and there are no external indications of physical injury, he may give his opinion, based on the general appearance and actions of the plaintiff, as to whether the pain is real, feigned or imaginary. Persons who saw or were in attendance upon the plaintiff after the injury may also testify as to his suffering and its extent."

The defendant complains that the lower court erred in permitting the plaintiff to introduce mortality tables, arguing that there was no evidence that the plaintiff was permanently unable to work. Dr. Olsen testified: "In my opinion he was disabled from the performance of his duty as a fireman."

He did say that the plaintiff could do some work which would require "an average amount of physical activity" but added "I don't think that he can stand too much in the way of extremes of physical or emotional stress."

The lower court, however, well pointed out that the defendant engaged in a fallacy when he argued that the jury's verdict could be justified only on the basis of a permanent loss of earning power. The court said: "The record shows that both Dr. Channick and Dr. Olsen agreed that Laurelli's persistent facial pain would permanently disable him from performing other than light duties. Thus, the jury could readily have found that there was an impairment of earning capacity. Moreover, in view of the intense pain the plaintiff has undergone and will in the future suffer, his verdict could be justified on the basis of compensation for pain and suffering only."

The defendant contends further that the trial judge failed to explain to the jury "the difference between permanent, chronic and recurrent disability." In the first place, the words explain themselves. In the second place, as just indicated, the issue was not only the

impairment of earning power but the continuity of disabling pain. Even though one could with gritting teeth and aching body apply himself to remunerative employment he would still be entitled to compensation for the physical anguish inflicted upon him by a tortfeasor. There is something more to life than earning one's bread—and eating it salted with the agony of ceaseless pain.

Prior to the trial, both sides agreed that Laurelli would submit to an examination by Dr. Michael Scott and that either side could call him as a witness. He was called by the defendant and he stated in various ways that he was an impartial witness. Plaintiff's counsel vigorously cross-examined him on his findings and conclusions. The defendant complained to the court below, and now here, that plaintiff's counsel had no right to do this and should have referred to him always as an impartial witness. We see nothing wrong about the cross-examination. An attorney cannot permit what he regards as error to come from the witness stand unchallengingly, regardless of declarations of impartiality on the part of the witness.

Two other points need to be touched upon briefly. The defendant ascribes error to the court below because it did not withdraw a juror when a police officer spoke to a member of the jury panel during a court recess. We accept as a fair statement of the situation what the lower court said in this connection, namely: "At the time of this incident, the court fully investigated the matter and we fail to see how any possible prejudice could have arisen from the innocent conversation he engaged in. It should be observed that the incident did not even involve a juror but was rather a member of the jury panel not sitting on the trial of this case. The remark itself was innocuous and had nothing to do with trial of the case."

The trial was a long one, the printed transcript of the record runs 1106 pages. The opposing advocates are experienced and resourceful. They threw into the trial all their energies, abilities, know-how, wit and sarcasm, and, in their final summations, fired every rhetorical cannon, exploded every forensic bomb, and shot every polemic sky rocket and Roman candle at hand. The defendant now complains that the plaintiff's counsel's summation was inflammatory and prejudicial, citing *Girard Tr. Corn Ex. Bank v. Phila. Tr. Co.,* 410 Pa. 530. Both speeches have been printed and while they do not seem very incendiary in cold print, one can believe that they were delivered with such earnestness and passion that each seemed to the other side to be a veritable bonfire of a harangue. The speeches do not appear to be such to us. The trial judge, who had an orchestra seat in the forensic theater, was thus able, more competently than we, sitting in the high gallery of appellate review, to gauge the heat of the speech of plaintiff's counsel. He apparently was not too much impressed with the argument that counsel engaged in improper exhortation and disposed of this portion of the defendant's motion for a new trial with the statement: "Counsel for defendant was also accusatory (if we use his definition) and it would seem unfair that after he employed trial techniques similar to those of plaintiff's counsel, he should complain about his opponent's conduct."

In addition, the court pointed out that defendant's counsel at no time made a motion for the withdrawal of a juror because of alleged improper remarks of plaintiff's counsel.

Judgment affirmed.