## DiChiacchio, Appellant, *v.* Rockcraft Stone Products Company.

Argued December 5, 1966. Before BELL, C. J., MUSMANNO, JONES, EAGEN, O'BRIEN and ROBERTS, JJ.

*Sheldon L. Albert,* with him *James E. Beasley,* for appellant.

*John J. O'Brien, Jr.,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 20, 1967:

On February 20, 1960, Joseph DiChiacchio, 42 years of age, was walking along Broad Street in Philadelphia when a plank, measuring 2 x 8 feet, crashed from a third-story height down on to his head and struck him to the ground. The force of the impact was such that the cap on one of his teeth and fillings from other teeth were forced out of his mouth which, with his nose, emitted blood. His left eye was swollen and he suffered other injuries, to be referred to later.

He brought suit in trespass against Rockcraft Stone Products Company which had constructed the scaffolding from which the plank had become detached and received a verdict in the sum of $25,000.[1] Rockcraft moved for a new trial on the grounds of excessiveness in the verdict. The court ordered that damages in excess of $12,000 be remitted within 30 days; otherwise a new trial would follow as to damages alone. The plaintiff refused to file a remittitur and the case is before us on appeal as to whether the law requires a new trial.

The defendant admitted liability for the accident so that the only issue for our consideration is the reasonableness of the verdict of $25,000.

On the day of the accident the plaintiff was taken to the St. Agnes Hospital for concussion of the brain, cuts on his face and over the left eye, headaches, dizziness and nervousness. He remained in the hospital for

---

[1] Rockcraft brought in John Renzulli as an additional defendant, and he was exonerated of all liability for the accident.

a week and then was taken home where he remained for another week. At the end of two weeks following the accident he returned to his work as a carpenter. When asked why he returned to his occupation he replied: "Well, I had a family to support and I was afraid of losing my job."

Dr. Joseph Cava, who cared for him at the hospital, continued to treat him for six months further for headaches, dizziness, and nervousness, sequels to the original diagnosis of concussion and "consistent with post concussion syndrome." In August, 1960, Dr. Cava referred the plaintiff to Henry Shenkin, a neurosurgeon, for additional care. Dr. Shenkin agreed with Dr. Cava that the plaintiff suffered from a post concussion syndrome with anxiety and nervousness. These ailments particularly affected the plaintiff in his carpentering work which required him to climb and descend ladders. During these activities he was often assailed by dizziness and, while working at the top of a ladder, he suffered from a constant fear of falling.

On October 9, 1962, he actually fell from the top of a ladder while hanging cabinets and was treated by Dr. Cava for the injury sustained in the fall, plus the continuing dizziness and headache. The trial judge, in describing the plaintiff's disabilities, said: "Even at the time of trial, which was more than five years after the injury, he [the plaintiff] told of having headaches several times each week. His testimony was that he was told that there was no medical aid available for his problems. He stated that at times the left side of his face and left eye feel numb, and that he still becomes dizzy when he is on a ladder while working. Plaintiff's wife testified that before his injury, he got along well with his children, but that since then he has not been patient with them, becomes easily upset, and is disturbed when driving an automobile. A specialist in internal medicine, who treated plaintiff,

testified that plaintiff's headaches and dizziness were due to the concussion of the brain that he had suffered. This physician, having made a diagnosis of post concussion syndrome with an anxiety, nervousness, referred plaintiff to a neurosurgeon. In 1962, while working on a ladder, plaintiff got dizzy, lost his balance and fell, thus hurting his shoulder. In the opinion of the specialist in internal medicine, plaintiff's headaches and dizziness resulting from the accident could go on indefinitely in the future."

In view of this appraisement of the plaintiff's disablement, it is incomprehensible why the trial judge ordered a remittitur of $13,000. Nowhere in his able opinion, which thoroughly discusses the case from every angle, does he suggest a reason for reducing the verdict. He does not say that the amount of the verdict shocked his judicial conscience. He does not suggest that the amount violated any rule for the computation of damages. On the contrary, the whole opinion, with the exception of the sentence ordering the remittitur, is a strong argument justifying the plaintiff's right to retain the verdict awarded him by the jury. The trial judge emphasizes the fact that the "defendant produced no testimony whatsoever to contradict, challenge or dispute plaintiff's evidence as to the damages."

Indeed, it is a mystery how the defendant seeks to minimize with argument the extent of the plaintiff's injuries and disablement, and yet refrained from producing a single witness to contradict the testimony of the plaintiff and the testimony of his physician as to his injuries. It is also important to note that the absence of defendant witnesses at the trial was not due to the lack of anyone to call because the defendant had had the plaintiff examined by its own doctor. The failure to produce that doctor can only lead to the conclusion that that doctor could not contradict the medical evidence presented by the plaintiff and his

doctor. This absence of contradicting evidence obviously made quite an impression on the trial judge, and impelled him to the utterance, as already indicated: "It is important to note that defendant produced no testimony whatsoever to contradict, challenge or dispute plaintiff's evidence as to the damages."

The defendant asks for a new trial, but of what use would be a new trial? If the defendant did not call its doctor at the first trial, it probably would not call him at a second trial, moreover there is no justification for any intellectual conclusion that a succeeding jury would give the plaintiff a lesser verdict than the one returned at the first trial, which, under all criteria and standards of proper verdicts, is not an excessive one, considering the original injuries and the continuing nature of the plaintiff's disablement.

Nervousness and dizziness to a carpenter who must climb ladders, walk over narrow planks high above the ground, and reach out into space to nail together scaffolds and supports is as grave an occupational hazard as a deep sea diver operating with a defective diving helmet or a window cleaner lacking a safety belt. Nor is there time for Joseph DiChiacchio to learn another trade. At the time of the trial he was already 47 years of age; his schooling was limited to a seventh grade education. Carpentering is all he knows. If dizziness, nervousness and headaches keep him off the ladder it will keep bread off the table for himself and his family.

The defendant argues that the plaintiff did not prove any impairment of earning power, although, as we will see later, it did not complain when the judge charged on impairment of earning power. The defendant's brief points out that the plaintiff's wages were no less after the accident than before and argues that this shows he has suffered no economic wage potentiality. But the fact that the plaintiff has not had a diminution in wages since the accident does not of

itself prove an absence of impairment of earning power. To give a very simple and didactic illustration: An injured working man who was earning $100 a week before an accident and received $125 a week after the accident could still establish impairment of earning power if the facts would indicate that, had it not been for his injuries, his pay envelope would have contained $150 a week. The test is not exclusively a comparison of before-and-after figures, but a determination as to whether, because of the injuries, the injured man's economic horizon has been shortened. We so stated in *Bochar v. Martin Motors,* 374 Pa. 240: "Has the economic horizon of the disabled person been shortened because of the injuries sustained as the result of the tortfeasor's negligence?" We said further: "The defendants contend that there was no evidence of impairment of earning power and that the fact that Bochar's wages were higher after the accident than before proves no deterioration of earning ability. A tortfeasor is not entitled to a reduction in his financial responsibility because, through fortuitous circumstances or unusual application on the part of the injured person, the wages of the injured person following the accident are as high or even higher than they were prior to the accident. Parity of wages may show lack of impairment of earning power if it confirms other physical data that the injured person has completely recovered from his injuries. Standing alone, however, parity of wages is inconclusive."

There can be little doubt that DiChiacchio's horizon as a carpenter has been shortened by an accident which has riveted to his consciousness a dread of falling and intermittent dizziness.

At the trial the court charged the jury: "His disability may continue for the remainder of his natural life. You will have to consider and determine the extent to which he is disabled. You will have to consider

and determine the effect of the disability resulting from the injuries sustained by reason of his being hit by the plank. You have had opportunity to note his physical condition as he appeared before you on the witness stand. You have the testimony that he has headaches, dizziness when he is on ladders or scaffolds in the doing of his work as a carpenter. It is for you to determine over what period of life he will suffer from a diminution of his earning capacity and the extent of that diminution. As he grows older his capacity to earn may more or less decrease."

The defendant took no exception to this portion of the charge. In fact, the defendant affirmatively accepted it as proper. At the end of the charge defendant's counsel said to the judge: "I don't think that you instructed the jury, sir, that they are not to reduce the present worth, the award for future pain and suffering, that only the award for impairment of earning capacity is to be reduced to present worth."

The court then charged: "But in order that there be no question about it, ladies and gentlemen, as I stated in my charge, after you determine the amount of the impairment of the plaintiff's power to earn you should reduce that to its present worth. However, as to the pain and suffering, after you determine that amount it should not be reduced to its present worth."

Of what use would be a new trial when every possible situation that can be anticipated in a trial has already been anticipated and properly adjudicated in the first trial?

Defendant's counsel argues that the court erred in allowing the introduction of tables as to life expectancies. The trial court properly disposed of this complaint in his opinion by saying: "It was not error to admit evidence of plaintiff's life expectancy. There was testimony by the physician, who treated plaintiff, upon which the jury could have premised a finding

that the symptoms which plaintiff has experienced since the accident could continue for the rest of his life. In a case where the proof showed that the plaintiff would have intermittent and recurring low back pain and discomfort for the rest of her life, the introduction of life tables of vital statistics was held to be proper. Griest v. Playtown, Inc., 414 Pa. 58, 62, 64. In another case, it was held that 'in view of the . . . pain the plaintiff has undergone and will in the future suffer, his verdict could be justified on the basis of compensation for pain and suffering only,' even if there was no permanent loss of earning power. The Supreme Court stated that 'the issue was not only the impairment of earning power but the continuity of disabling pain. Even though one could with gritting teeth and aching body apply himself to remunerative employment he would still be entitled to compensation for the physical anguish inflicted upon him by a tortfeasor. There is something more to life than earning one's bread—and eating it salted with the agony of ceaseless pain.' Laurelli v. Shapiro, 416 Pa. 308, 316-317."

It is to be noted also, as observed by the trial judge: "It was asserted that a portion of the charge to the jury in connection with the life expectancy tables was error. However, the record does not show that counsel for the defendant requested an exception to the instruction later complained of. Failure to except to instructions in the charge, except as to basic and fundamental matters, operates as a waiver of any defect or omission. Tropical Paint & Oil Co. v. Sharon Bldg. Co., 313 Pa. 51, 52. Medvidovich v. Schultz, 309 Pa. 450, 453. There was no error in the instruction at issue, and certainly none which could be construed as basic and fundamental."

The plaintiff has not only been seriously handicapped in his occupation. He has also lost much that goes into making life enjoyable. The plank that fell

on his head from a third story slivered into a corrugation of the brain that intangible discomfort which has made DiChiacchio irritable with even those who love him most, his children. He has lost equanimity and peace, without which life can be a torment. The trial court, speaking on this subject, said: " 'Infliction of pain means taking from a person what is his own to possess and retain, namely, health and well-being. Whoever robs another of that health and well-being is required by law to make recompense, to the extent that the deprivation may be calculated in money damages.' Thompson v. Iannuzzi, 403 Pa. 329, 331. In a case where it was contended that the injuries sustained by the plaintiff were not related to earning power, and should therefore not be the subject of damages, it was held that 'The object of a trespass action involving personal injuries, where the plaintiff has proved his case, is to compensate him for what he has lost as a result of the defendant's negligence. The loss of well-being is as much a loss as an amputation. The inability to enjoy what one has heretofore keenly appreciated is a pain which can be equated with the infliction of a positive hurt. The conscious loss of a benefit to which one is entitled hurts as much as a festering wound.' Corcoran v. McNeal, 400 Pa. 14, 23."

There is no magic formula for determining what is the exact amount a disabled person is entitled to receive for what has been tortiously taken away from him. But, despite all the theories and speculations as to what can be done by technical experts and mechanical comptometers for computing the price of pain, the fact remains that the jury is the best agency equipped to confront practical problems in court and practically resolve them. Twelve persons chosen from many walks of life, knowledgeable in the ways and manner of every day people, enter a courtroom, study the injured person, listen to what he says and what others have to

say, accept the guidance offered to them by the judge, and then decide what the wronged, injured person should receive because of a plank that fell on his head, causing him from then on to wobble not only on the carpenter's ladder but on the path of life still left for him to tread.

The defendant had the opportunity to produce its own witnesses. Of its own volition it produced none. Why should the enormous, complicated, expensive machinery of the courts be required to go through another trial when both sides have already had the fullest opportunity to explain their case; and the jury, sworn to do justice according to law, has done that justice in such a manner that the presiding judge found no fault with it? No one suggests that the jury had any motivation, aside from doing justice, in agreeing on the amount of $25,000 as proper damages for what the plaintiff has suffered and will continue to suffer.

It is to be repeated that the trial judge in no way indicated that it was shocked by the verdict. Nor are we.

The order of the court below is reversed with directions that the verdict be reinstated.

Mr. Justice JONES, Mr. Justice EAGEN, Mr. Justice O'BRIEN and Mr. Justice ROBERTS concur in the result.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I dissent.

It is long and well established that a trial court possesses and has frequently exercised the inherent power to reduce a jury verdict by remittitur or in the alternative to grant a new trial. *Bennett v. Biddle,* 150 Pa. 420; *Dornon v. McCarthy,* 412 Pa. 595, 599, 195 A. 2d 520, and many cases cited therein. In such a situation the test in an appellate court is whether the trial court which saw and heard the witnesses—which

an appellate court does not—committed in its order a manifest abuse of discretion or a clear error of law which controlled the outcome of the case. *Nicholson v. Garris,* 418 Pa. 146, 210 A. 2d 164; *Williams v. Philadelphia Transportation Company,* 415 Pa. 370, 203 A. 2d 665.

A remittitur of a very substantial portion of the verdict is not unusual, and, where justified, it should stand. See *Dornon v. McCarthy,* 412 Pa., supra, where we affirmed an order which reduced the jury's verdict from $30,000 to $13,000, and the numerous cases cited therein.

The appellants have not established that the trial court committed a manifest abuse of discretion or an error of law.