**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| RALPH M. BAILETS | : | No. 126 MAP 2016 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court at No. 265 MD |
| | : | 2009 dated December 1, 2016. |
| | : | |
| PENNSYLVANIA TURNPIKE | : | ARGUED:  November 29, 2017 |
| COMMISSION, ANTHONY Q. MAUN, | : | |
| (DIRECTOR OF ACCOUNTING), AND | : | |
| NIKOLAUS H. GRIESHABER, (CHIEF | : | |
| FINANCIAL OFFICER) | : | |
| | : | |
| | : | |
| APPEAL OF:  PENNSYLVANIA | : | |
| TURNPIKE COMMISSION | : | |

## OPINION

**JUSTICE DOUGHERTY**                                      **Decided: March 27, 2018**

This is a direct appeal by defendant/appellant Pennsylvania Turnpike Commission ("PTC") from the Commonwealth Court's order entering judgment on a $3.2 million verdict in favor of plaintiff/appellee Ralph M. Bailets ("Bailets") following a non-jury trial of his claims arising under the Whistleblower Law, 43 P.S. §§1421-1428 ("Law").  The verdict included $1.6 million in non-economic damages.  PTC presents a question of first impression in Pennsylvania: whether non-economic damages for items such as embarrassment, humiliation, loss of reputation and mental anguish are available to plaintiffs in actions brought under the Law.  Additionally, if non-economic damages are authorized under the Law, PTC asks us to determine whether the verdict amount was excessive in this case.  We conclude non-economic damages are available

to successful plaintiffs under the Law and the trial court did not err or abuse its discretion in entering a verdict amount of $1.6 million. Accordingly, we affirm the judgment.

## A. Background

Bailets was employed by PTC for ten years prior to his termination in November 2008. He was the Manager of Financial Systems and Reporting, responsible for a staff of programmers and business analysts, and it was his duty, among other things, to ensure PTC's financial reports were produced accurately and in a timely fashion. Bailets reviewed submissions in response to requests for proposals PTC issued seeking bids for the creation and implementation of a computerized financial reporting system. He voiced concern to his immediate supervisor, Director of Accounting, Anthony Q. Maun ("Maun"), that one of the bidders for the implementation contract, Ciber, Inc. ("Ciber"), had an unfair advantage over other vendors/bidders, because Ciber had previously been awarded a $3.4 million contract to identify the requirements upon which any implementation would be based. In 2005, despite having submitted the highest bid, Ciber was awarded a $53.8 million implementation contract. Maun told Bailets not to make waves regarding Ciber or his job would be in jeopardy.

After Ciber secured the implementation contract, Bailets voiced numerous complaints to Maun regarding Ciber's poor performance, including high turnover and absenteeism of Ciber consultants, testing failures, and lack of knowledge transfer from Ciber consultants to PTC employees. In 2007, Bailets reported to Maun that senior management should be informed implementation problems were being caused by Ciber's deficient performance, particularly in the area of knowledge transfer, *i.e.*, Ciber

consultants failed to deliver information to PTC employees regarding how the computerized financial reporting system actually operated.

Bailets also complained about Ciber's performance to a co-worker, Nikolaus H. Grieshaber ("Grieshaber"). Grieshaber acknowledged Ciber was politically connected within the PTC hierarchy, and warned Bailets to tread lightly in his complaints about Ciber. The problems with implementation of the system continued and by June 2008, the roll-out of the system was three months behind schedule. In June 2008, Grieshaber was promoted to the position of CFO, becoming Maun's immediate superior. Shortly after his promotion, Grieshaber sent an email to PTC's COO, George Hatalowich, stating, among other things, that Grieshaber had "a lot of misgivings about … Bailets[,]" and that PTC needed to "keep a short leash on him." Trial Ct. Op., 10/6/16 at 9 (citing Trial Ex. 137).[1] In July 2008, Bailets was reassigned to the purchasing department. In August 2008, Ciber was awarded an additional $19.7 million contract to conduct knowledge transfer. Bailets continued to complain to Maun regarding Ciber's deficiencies. On November 20, 2008, PTC's Human Resources Director informed Bailets his position was being eliminated for budgetary reasons. Bailets was directed to immediately pack his personal belongings and was escorted from the building.

Believing he was terminated in retaliation for his reports of wrongdoing and waste, Bailets filed a complaint in the Commonwealth Court's original jurisdiction, alleging a single claim under the Law against PTC.[2] PTC filed a motion for summary

---

[1] Trial took place in the Commonwealth Court from May 23, 2016 to May 26, 2016, following remand by this Court from a prior appeal. *See Bailets v. Pa. Turnpike Comm'n*, 123 A.3d 300 (Pa. 2015). We refer to the Commonwealth Court's unpublished opinion in support of its verdict as "Trial Ct. Op."

[2] The parties filed a pre-trial stipulation of discontinuance as to additional named defendants Anthony Q. Maun and Nikolaus H. Grieshaber.

judgment claiming Bailets was terminated, along with fourteen other employees, in an organization-wide effort to reduce expenses. In an unreported single-judge opinion, the court held the decision to terminate Bailets was "a management discretionary action, motivated by legitimate employer objectives[,]" and granted summary judgment in favor of PTC. *Bailets v. Pa. Turnpike Comm'n*, No. 265 MD 2009, unpublished memorandum at 11 (Pa. Cmwlth. February 4, 2014). Bailets appealed and this Court reversed, reasoning Bailets's complaint clearly presented *prima facie* evidence of violations of the Law which "at the very least created material issues of fact to preclude the grant of summary judgment[,]" and remanded to the Commonwealth Court for further proceedings. *Bailets v. Pa. Turnpike Comm'n*, 123 A.3d 300, 309-10 (Pa. 2015).

A four-day non-jury trial in the Commonwealth Court ensued in May 2016 at which Bailets presented evidence in support of his claim he was fired by PTC due to his reports of waste and wrongdoing. With respect to evidence of economic damages, Bailets presented the expert testimony of economist Andrew Verzilli, who, among other things, testified the accumulation of Bailets's past and future lost earnings resulting from his termination amounted to an "overall loss of $1,649,316[.00]." N.T. 5/25/16 at 514. With respect to non-economic damages, Bailets testified the emotional impact of losing his PTC employment was "devastating[,]" "humiliating[,]" "painful[,]" "very demeaning[,]" and "very difficult emotionally[,]" which caused him "no end of sleepless nights[.]" N.T. 5/23/16 at 190. Bailets specifically testified to the humiliation he felt because of the way he was fired — "being walked out of your employer with a box in your hand and being escorted out." *Id.* He further explained it was "certainly humiliating to use an unemployment card at [a] local grocery store" and testified he suffered mental distress contemplating "paying basic bills, repairs on an aging family van, [educational] expenses for my three daughters[,] . . . retirement savings, medical costs, all of those

things, you know, kept me awake many nights and laid heavily on me." *Id.* at 190-91. Bailets anguished over facing his father-in-law to inform him "I was no longer a provider for his daughter and his grandchildren." *Id.* at 190. He testified it was painful to tell his thirteen-year-old triplet daughters he no longer had a job and it "broke [his] heart" when one of his daughters later apologized to him "for needing new cleats because she outgrew them." *Id.* at 194.

Mrs. Ann Bailets testified her husband was terminated shortly before the Thanksgiving holiday and "he was embarrassed and humiliated about facing the members of my family . . . and telling them . . . he no longer had a job." N.T. 5/25/16 at 536. Mrs. Bailets additionally testified her husband initially took a minimum wage job as a driver at an automobile dealership just to have "some income," and in hopes of making business contacts that might lead to a better employment opportunity. *Id.* at 537-38. However, he became "frustrated" by his lack of success in securing adequate employment, and "he cried on occasions because he began to wonder if he was ever going to get a job." *Id.* at 538. Additionally, on a number of occasions he expressed his "guilt[ ] for putting our family through this." *Id.* Specifically, "he said that . . . maybe he should never have notified his employers of these things that were going wrong[,]" because if "he hadn't done that, . . . he would still be there." *Id.* At the same time, she testified he said he "wanted to be able to look in the mirror" and "know that . . . he had done what he thought was the right thing to do." *Id.*

The trial court concluded Bailets met his burden under the Law of proving he made a good faith report of PTC's wrongdoing and waste and PTC fired him in retaliation for making the report. In determining the issue of damages, the court first noted the Law permits the recovery of "actual damages," Trial Ct. Op. at 19, *quoting* 43

P.S. §1425,[3] and accepted the testimony of Bailets's forensic expert calculating his economic damages at $1.6 million. The court observed "[t]he term actual damages is not defined under the Law," but noted this Court has "made clear that actual damages include not only economic but non-economic injuries such as 'impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.'" *Id.* at 21, *quoting Joseph v. Scranton Times L.P.*, 129 A.3d 404, 429 (Pa. 2015) (additional citation omitted). The court relied on *O'Rourke v. Dep't of Corrections*, 778 A.2d 1194 (Pa. 2001), for the proposition the Law is remedial in nature and must be liberally construed. The court reasoned actual damages must include compensation for non-economic damages because *O'Rourke* emphasized a whistleblower must be put "in no worse a position for having exposed the wrongdoing[.]" Trial Ct. Op. at 22, *citing O'Rourke,* 778 A.2d at 1202. The court concluded "[w]ithout compensation for harm to his reputation, humiliation and mental anguish, Bailets would be in a far worse position for having reported the wrongdoing." *Id.* at 23 (footnote omitted). The court also noted other jurisdictions with "similar, if not identical, whistleblower protection laws[,]" have concluded non-economic damages are recoverable. *Id.* at 22-23 *citing Robertson County v. Wymola*, 17 S.W.3d 334, 347 (Tex. Ct. App. 2000) (actual damages under whistleblower law include damages for mental anguish).

---

[3] Specifically, Section 1425 of the Law provides: "A court, in rendering a judgment in an action brought under this act, shall order, as the court considers appropriate, reinstatement of the employee, the payment of back wages, full reinstatement of fringe benefits and seniority rights, **actual damages** or any combination of these remedies. A court shall also award the complainant all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, if the complainant prevails in the civil action." 43 P.S. §1425 (emphasis added).

In assessing the value of Bailets's non-economic damages, the trial court credited "the testimony of Bailets and his wife" regarding the deep humiliation, anguish and harm to reputation Bailets suffered as a result of his termination. Trial Ct. Op. at 24. The court concluded, "There is no doubt that [PTC's] wrongful termination of Bailets had a profound effect on Bailets and caused a major disruption to his life. Therefore, this court concludes that for his non-economic actual damages, which include harm to his reputation, humiliation, and mental anguish, Bailets is entitled to an award equal to that of his economic damages, or $1.6 million." *Id.* at 25.

PTC filed a motion for post-trial relief seeking, alternatively, judgment in its favor notwithstanding the verdict (n.o.v.), a new trial, reduction in the amount of economic damages (remittitur), and vacation or remittitur of the amount of non-economic damages. Following the denial of its post-trial motion and entry of judgment on the verdict, PTC appealed. This Court granted oral argument limited to the following issue, and affirmed the trial court's order in all other respects:

> Was the award of $1.6 million in non-economic damages proper where the Whistleblower Law does not permit such damages and where the amount of non-economic damages awarded was arbitrary, excessive, and lacking in any rational basis in the record?

*Bailets v. Pa. Turnpike Comm'n.*, 168 A.3d 172 (Pa. 2017) (quotation marks deleted).

## I. Availability Of Non-Economic Damages

PTC asserts Section 1425 of the Law does not permit a court to award non-economic damages. PTC acknowledges the Law permits an award of "actual damages," but argues where the General Assembly intends a statute's recovery for "actual damages" to include damages for non-economic harm, it does so explicitly. PTC's Brief at 26-27, *citing* 42 Pa.C.S. §8315 (actual damages arising from identity theft

include harm to reputation); 42 Pa.C.S. §8316.1(c) (actual damages arising from unlawful dissemination of intimate image include harm to reputation); 43 P.S. §959(f)(1) (actual damages for unlawful discrimination include those for humiliation and embarrassment). PTC posits if the phrase "actual damages" contained in a statute necessarily includes recovery for non-economic losses, there would be no reason for the General Assembly to explicitly include specific categories of such losses in some statutes but not others.

Moreover, PTC argues although non-economic damages are often described as compensatory, "they have essentially the same deterrent effect as punitive damages." PTC's Brief at 28, *citing D'Ambrosio v. Pa. Nat'l Mut. Cas. Ins. Co.*, 431 A.2d 966, 970 (Pa. 1981), *quoting* Murray on Contracts §232 at 472 (1974) ("it is difficult, if not impossible, to draw an incisive line between compensatory and punitive damages"), and *quoting* Dobbs on Remedies §12.4 at 819 (1973) ("Probably there is some thought, too, that mental distress damages closely resemble punitive damages in many instances and that such damages should be denied in all those cases where punitive damages are denied."). Thus, according to PTC, "[a]s a policy matter," the phrase actual damages as contained in the Law should not be read to include damages for non-economic losses because punitive damages are not authorized under the Law. *Id., citing Feingold v. SEPTA*, 517 A.2d 1270, 1277 (Pa. 1986) (public policy implications of assessing damages against taxpayers weighed against necessity of punishing entity performing public function; inappropriate to assess punitive damages against SEPTA, a Commonwealth agency, because punitive damages are windfall for fully compensated plaintiff). PTC asserts, "[t]his public policy concern is at its zenith" in the context of the present statute and others like it that create potential liability for the Commonwealth and its agents because "[e]xceptions to the Commonwealth's sovereign immunity must be

narrowly interpreted." PTC's Brief at 28, *citing Mascaro v. Youth Study Center*, 523 A.2d 1118, 1123 (Pa. 1987) (real estate exception to Political Subdivision Tort Claims Act, as exception to immunity, must be narrowly interpreted given expressed legislative intent to insulate political subdivisions from tort liability). PTC insists the waiver of sovereign immunity must be "'unequivocally expressed'" and "'[a]ny ambiguities in the statutory language are to be construed in favor of immunity[.]'" *Id.* at 28, *quoting F.A.A. v. Cooper*, 566 U.S. 284, 290 (2012).

PTC argues the Commonwealth Court's reliance on *Scranton Times* is misplaced because that decision discussed actual damages for the tort of defamation, which by its nature, uniquely involves non-economic injury. PTC further argues the trial court's focus on the policy considerations announced by this Court in *O'Rourke* with respect to the remedial nature of the Law cannot be read in isolation, or outside the principles of statutory interpretation. PTC additionally notes the United States Supreme Court stated, "Because the term 'actual damages' has this chameleon-like quality, we cannot rely on any all-purpose definition but must consider the particular context in which the term appears." *Cooper,* 566 U.S. at 294 (unlawful disclosure of pilot's medical information did not entitle pilot to recover damages for mental and emotional distress under the Privacy Act, 5 U.S.C. §552a(g)(4)(a)).

PTC ultimately asserts if the General Assembly agrees non-economic damages should be included in a tabulation of actual damages for purposes of the Law, it can explicitly amend the Law to define the term in that manner, but as it is, the language is unclear, and the trial court's resolution is erroneous as a matter of law. In sum, PTC's argument rests on the assertion the Law is meant to provide an exception to sovereign immunity, and as such, its provisions must be strictly and narrowly construed.

Bailets responds "PTC's mischaracterization of the Law as a waiver of sovereign immunity requiring a narrow interpretation[,]" is contrary to binding precedent set forth by this Court, which ruled the Law is "chiefly a remedial measure intended to 'enhance openness in government and compel the government's compliance with the [L]aw by protecting those who inform authorities of wrongdoing.'" Bailets's Brief at 41-42, *quoting O'Rourke*, 778 A.2d at 1202. Bailets observes this Court has explained, "remedial statutes are to be liberally construed to effect their objects." *Id.* at 42, *quoting O'Rourke* at 1203, *citing* 1 Pa.C.S. §1928(c) (all statutory provisions, other than eight enumerated classes not applicable here, must be liberally construed). Thus, Bailets asserts anything short of full protection of whistleblowers would undermine the remedial purpose of the Law.

Bailets additionally asserts, in light of the important remedial nature of the Law articulated by this Court in *O'Rourke*, the term "actual damages" is not ambiguous. Bailets instead maintains "[o]ur courts have long considered the term 'actual damages' to include non-economic as well as economic damages[,]" observing this Court's decision in *Scranton Times* explained actual damages include relief for "monetary and non-monetary injuries, such as 'impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.'" Bailets's Brief at 43-44, *quoting Scranton Times*, 129 A.3d at 429, *quoting Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349-50 (1974). Bailets points out this Court's broad and inclusive definition of "actual damages" comports with the Black's Law Dictionary definition at the time the Law was enacted, and which equated actual damages with compensatory damages. *Id.* at 44, *citing* BLACK'S LAW DICTIONARY (5th ed. 1979); *see also* 22 AM.JUR.2D §25 (actual damages synonymous with compensatory damages). Bailets maintains, in crafting the Law, the legislature was well aware of the meaning and

definition of the phrase "actual damages," which he asserts unambiguously includes damages for non-economic harm. Moreover, Bailets argues other states with whistleblower statutes similar or identical to the Law have concluded the term "actual damages" includes damages for non-economic harm.

Bailets also maintains the legislature's inclusion of damages for particular categories of non-economic losses in some other statutes does not show any intent to exclude non-economic damages as a whole from the tabulation of actual damages available under the Law, and to accept PTC's suggestion that actual damages under the Law include only economic damages would render superfluous the Law's mandate that remedies include the payment of back wages. Bailets's Brief at 48, *citing* 43 P.S. §1425. Ultimately, Bailets argues to award anything short of Bailets's full damages — including non-economic damages — would undermine the very purpose of the Law to protect and encourage employee reporters of waste and wrongdoing.[4]

As stated, the first question before us involves the propriety of the Commonwealth Court's order denying PTC's post-trial motion for judgment n.o.v.[5] Our

---

[4] In support of Bailets, *amicus* A.F.S.C.M.E. District Council 33, similarly argues "[u]nless workers possess the unhindered ability to report such issues [(waste and wrongdoing)] to employers or law enforcement authorities, the principal aims of the Whistleblower Law — protecting the public against waste and fraud in government by encouraging employees not to remain silent for fear of losing their jobs — will remain unfulfilled. AFSCME's Brief at 2. In addition, The Pennsylvania Association for Justice also argues the Law is a remedial statute intended to encourage and protect those who would expose public waste and wrongdoing, and supports its intended objective by permitting the recovery of both economic and non-economic damages. "Any other conclusion undermines the statute and its capacity to fulfill the public policy that animates its provisions." PAJ's Brief at 2.

[5] PTC's first issue involves its claim for judgment n.o.v. or vacation of the award of non-economic damages on the assertion non-economic damages are not available under the Law. Alternatively, in its second issue discussed *infra*, PTC seeks remittitur of the non-economic damages awarded, alleging the award is excessive.

scope of review with respect to whether judgment n.o.v. is appropriate is plenary, as with any review of questions of law. *Shamnoski v. PG Energy*, 858 A.2d 589, 593 (Pa. 2004). Our standard of review when examining the lower court's refusal to grant a judgment n.o.v. is whether, when reading the record in the light most favorable to the verdict winner and granting that party every favorable inference therefrom, there was sufficient competent evidence to sustain the verdict. *Id.* Although we accord deference to a trial court with regard to its factual findings, our review of its legal conclusions is *de novo. Commonwealth ex rel. Gibson v. DiGiacinto*, 439 A.2d 105, 107 (Pa. 1981). The trial court's determination regarding the scope of the term "actual damages" under the Law constitutes a legal conclusion and issues of statutory interpretation present this Court with questions of law for which our standard of review is *de novo*, and our scope of review is plenary. *Pennsylvania Pub. Util. Comm'n v. Andrew Seder/The Times Leader*, 139 A.3d 165, 172 (Pa. 2016).

We begin by observing the Law does not define the term "actual damages," and it appears only once, in Section 1425:

> A court, in rendering a judgment in an action brought under this act, shall order, as the court considers appropriate, reinstatement of the employee, the payment of back wages, full reinstatement of fringe benefits and seniority rights, **actual damages** or any combination of these remedies. A court shall also award the complainant all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, if the complainant prevails in the civil action."

43 P.S. §1425 (emphasis added). Our precedent does not readily provide a definition of the term, but we have previously described three separate categories or types of damages:

> Compensatory damages are such damages as measure the actual loss, and are allowed as amends therefor. Exemplary, punitive, or vindictive damages are such damages as are in excess of the actual loss, and are allowed in theory when a tort is aggravated by evil motive, actual malice, deliberate violence, or oppression or fraud. . . . Of nominal damages, the

definition is a trivial sum awarded where a mere breach of duty or infraction of right is shown with no serious loss sustained.

*Springer v. J.H. Somers Fuel Co.*, 46 A. 370, 372 (Pa. 1900).

Moreover, the parties advance different definitions for "actual damages," both of which are arguably supported by the plain language. *See, e.g., Cooper*, 566 U.S. at 294 (phrase "actual damages" has "chameleon-like quality" which an "all purpose definition" does not satisfy). Under such circumstances, where the meaning is not clear and unambiguous, we turn to our well-established principles of statutory construction. *See, e.g., A.S. v. Pennsylvania State Police*, 143 A.3d 896, 903 (Pa. 2016) (when statutory text is ambiguous Court may go beyond text and look to other considerations to discern legislative intent, such as the occasion and necessity for the statute, the circumstances under which it was enacted, the mischief to be remedied, and the object to be attained).

The cardinal rule of all statutory construction is to ascertain and effectuate the intent of the Legislature. *See* 1 Pa.C.S. §1921(a). In doing so, we do not interpret statutory words or phrases in isolation, but must read them with reference to the context in which they appear. Moreover, we may also consider such factors as the mischief to be remedied, *see* 1 Pa.C.S. §1921(c)(3); the object to be attained, *see* 1 Pa.C.S. §1921 (c)(4); and the consequences of a particular interpretation, *see* 1 Pa.C.S. §1921(c)(6). In this case, the parties embrace diametrically opposed viewpoints regarding the Law's purpose. PTC asserts it is meant to provide a limited exception to sovereign immunity, and as such, its provisions must be strictly construed to avoid a punitive outcome, while Bailets argues the Law is remedial in nature, and thus, its provisions must be liberally construed to promote a fully restorative outcome.

It is clear enough the Commonwealth did not expressly waive immunity for whistleblower claims until the enactment of the Law. *Cf. Doe v. Franklin Co.*, 174 A.3d

593, 605 (Pa. 2017) (where General Assembly intends to provide exceptions to immunity, such exceptions must be specifically and explicitly expressed). It is equally clear, as this Court has previously held, the Law is primarily designed as a "remedial measure intended to 'enhance openness in government and compel the government's compliance with the law **by protecting** those who inform authorities of wrongdoing.'" *O'Rourke*, 778 A.2d at 1202 (emphasis added, additional citation omitted). Although we recognize the Law's design perhaps entails overlapping purposes of waiving sovereign immunity on the one hand, and of compelling compliance by protecting those who expose wrongdoing on the other, we cannot accept PTC's conclusion the sovereign immunity waiver aspects of the Law override its remedial protective aspects when it comes to determining the precise meaning of the phrase "actual damages" under the Law.[6] We therefore reject PTC's suggestion the provisions of the Law must be narrowly construed. *See O'Rourke*, 778 A.2d at 1203 (remedial statutes are to be liberally construed to effect their objects), *citing generally* 1 Pa.C.S. §1928(c). Instead, we view the immunity waiver aspect of the Law as supportive of its primary purpose — to protect whistleblowers who come forth with good faith reports of wrongdoing. Our conclusion in this regard is buttressed by the fact the Law is not strictly limited to public employers, but also protects employees fired in retaliation for exposing wrongdoing by private employers that receive public funds. Accordingly, we determine the Law's provisions

---

[6] Indeed, this Court has previously noted the "penal" provisions of the Law, *see* 43 P.S. §1426 (permitting imposition of civil fines and suspension from public service for up to six months against employers), are secondary to and supportive of the primary purpose of the statute, which is to encourage employees to come forward in good faith with information about substantial illegal or unethical conduct. *O'Rourke v. Dep't of Corrections*, 778 A.2d 1194, 1203 n.11 (Pa. 2001), *citing* 43 P.S. §1424, Historical and Statutory Notes (stating purpose of Law is to "provid[e] **protection** for employees who report a violation[.]") (emphasis added).

must be liberally construed to effect its salutary remedial object. *O'Rourke*, 778 A.2d at 1203.

Next, we observe our jurisprudence has long recognized non-economic losses are actual losses. *See Singer v. Sheppard*, 346 A.2d 897, 901 n.9 (Pa. 1975) ("Pennsylvania law clearly indicates that non-economic losses are actual losses."), *citing Laurelli v. Shapiro*, 206 A.2d 308 (Pa. 1965), and *Corcoran v. McNeal*, 161 A.2d 367 (Pa. 1960). Indeed, PTC does not submit, nor could it, that losses for categories of injury such as humiliation, mental anguish, and loss of reputation are not "actual." PTC's argument, instead, is that the General Assembly intended "actual damages" under the Law to include recovery for economic injury only.

As stated, the phrase "actual damages" appears in the Law in the following context: "in rendering a judgment in an action brought under this act, [a court] shall order, as the court considers appropriate, reinstatement of the employee, the payment of back wages, full reinstatement of fringe benefits and seniority rights, actual damages or any combination of these remedies." 43 P.S. §1425. Thus, actual damages are included with the combination of remedies available under the Law, some of which, such as payment of back wages, are clearly understood as pertaining to purely economic losses. If "actual damages" was meant by the General Assembly to de-limit recovery only to economic losses, its inclusion in the tabulation of potential remedies with "back wages" would appear to add recompense for only one additional category of harm; *i.e.*, future economic loss. Such a construction would render the phrase "actual damages" practically superfluous as the phrase would encompass future economic loss only. Moreover, such a construction would ignore precedent which holds actual damages include those for non-economic losses, *see, e.g., Scranton Times*, 105 A.3d 655, as well as the long-held understanding that actual damages are synonymous with

compensatory damages which, of course, include damages for actual loss. *J.H. Somers Fuel Co.*, 46 A. at 372.

Turning to an examination of the object to be attained, this Court has concluded via statutory analysis of a separate passage in the Law, that the General Assembly's intent in enacting the Law was "protecting those who inform authorities of wrongdoing," and that absent some assurance an "employee will ultimately be put in no worse a position for having exposed the wrongdoing[,]" the Commonwealth would forego the benefit whistleblowers provide. *O'Rourke*, 778 A.2d at 1202. *O'Rourke* also noted "recovery under the statute is proportionate to the harm suffered, as punitive damages are not available." *Id.* at 1202-03. Given the overriding purpose of the Law and our determination a whistleblower must be put in no worse a position for having reported the wrongdoing, we cannot view the phrase "actual damages" as excluding damages for such items of loss as humiliation, embarrassment and mental anguish because if no recovery for such items of loss are available, a whistleblower cannot be made whole. Similarly, in viewing the consequences of a particular interpretation, any construction which limits the phrase "actual damages" to economic losses leaves whistleblowers uncompensated for any non-economic harms they might suffer as a result of their decision to expose the wrongdoing of their employers, harms which lie completely outside such items as loss of pay and benefits. Accordingly, in view of the Law's purpose and the context in which the phrase "actual damages" appears, as well as our determination the Law must be liberally construed to achieve its remedial purpose, we hold the trial court did not err in determining actual damages for non-economic losses are recoverable under the Law.[7]

---

[7] Our conclusion mirrors those of other jurisdictions that have similar whistleblower statutes. We noted in *O'Rourke*, that Texas's statute is "chiefly a remedial measure intended to 'enhance openness in government and compel the government's (continued…)

In sum, we hold the General Assembly's use of the phrase "actual damages" expressed its intention that a successful plaintiff/claimant in a whistleblower action may recover damages for non-economic losses such as humiliation, embarrassment, loss of reputation and mental anguish in addition to any other remedies available under the Law.

## II. Amount of Non-Economic Damages Awarded

PTC insists "[e]ven if the Commonwealth Court had authority to award non-economic damages under the Whistleblower Law," the award of $1.6 million in non-economic damages was excessive and unsupported by the evidence. PTC's Brief at 31-32. PTC concedes Bailets's non-economic injury consisted of "humiliation at being escorted" from PTC "with his belongings in a box; pain from telling his wife, daughters, and father-in-law that he lost his job; embarrassment from facing his extended family after being terminated; humiliation from telling friends he did not have a job and from using his unemployment compensation debit card at the grocery store; frustration and anxiety from not being able to obtain a job for three years; and guilt from putting his family through the experience." *Id.* at 32. Nevertheless, PTC argues "[o]ne need not minimize the emotional strain that Mr. Bailets experienced to conclude that the

---

(…continued)

compliance with the law by protecting those who inform authorities of wrongdoing.'" *O'Rourke*, 778 A.2d at 1202, *citing Davis v. Ector County*, 40 F.3d 777, 785 (5th Cir. 1994) (articulating purpose of similar Texas whistleblower law). The Texas law permits recovery of "actual damages" for non-pecuniary items of loss such as emotional pain, suffering, inconvenience, and mental anguish, but caps recovery for those items of loss between $50,000 and $250,000 depending on the size of the employer. Tex. Gov't Code §§554.003(a), (c). Additionally, the Michigan Whistleblowers' Protection Act, which is practically identical to Pennsylvania's Law, provides for the remedy of "actual damages," and Michigan jurisprudence has noted damages for emotional distress and humiliation are clearly authorized thereby. Mich. Comp. Laws §15.364. *See Melchi v. Burns Int'l Sec. Servs., Inc.*, 597 F.Supp. 575 (E.D. Mich 1984). We consider these rulings persuasive.

Commonwealth Court vastly overcompensated him for it." *Id.* PTC notes there was no medical evidence of "Bailets's distress, no evidence of doctors' visits for related physical problems, and no evidence of counseling." *Id.* PTC acknowledges evidence in the form of some physical manifestation of distress or expert testimony is not required to obtain an award but notes "such evidence certainly would be beneficial." *Id.* at 32-33, *quoting Stonehill Coll. v. Mass. Comm'n Against Discrimination*, 808 N.E.2d 205, 225 (Mass. 2004). The gravamen of PTC's claim is that the emotions Bailets felt after his termination "are typical of anyone's experience while between jobs." *Id.* at 33.

PTC further argues the court merely equated Bailets's non-economic damages to his economic damages without record support for that determination. Moreover, PTC alleges the court "hinted at its motivation for such a large award of non-economic damages in a footnote" of its opinion that stated punitive damages are not available under the Law. *Id.* at 35. Thus, PTC suggests, without explicitly alleging, the court improperly awarded $1.6 million to Bailets not as recompense for his injuries, but to punish PTC. PTC concludes, "Because the non-economic damages awarded in this case are punitive, arbitrary, and shock any sense of justice, the award cannot stand." *Id.* at 36.

Bailets responds the hardship resulting from his termination was "devastating." Bailets's Brief at 50. He asserts the award of non-economic damages necessary to restore him to a "condition no worse than if he had not been wrongfully terminated, was supported by competent evidence and should not be disturbed on appeal." *Id.* at 51.

The assessment of damages is peculiarly within the province of the factfinder and an award will not be upset on appeal unless it is so excessive as to shock the conscience of the court or it is clearly based on partiality, prejudice or passion. *De Simone v. City of Philadelphia*, 110 A.2d 431 (Pa. 1955). Generally, under

Pennsylvania law, damages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences. *See, e.g.*, *Morin v. Brassington*, 871 A.2d 844, 852 (Pa. Super. 2005), *quoting J.W.S. Delavau Inc. v. Eastern America Transp. & Warehousing, Inc.*, 810 A.2d 672, 685 (Pa. Super. 2002); *James Corp. v. N. Allegheny Sch. Dist.* 938 A.2d 474, 494 (Pa. Cmwlth. 2007); *E.C. Ernst, Inc. v. Koppers Co., Inc.*, 626 F.2d 324, 327 (3d Cir. 1980). Where the amount of damages can be fairly estimated from the evidence, the recovery will be sustained even though such amount cannot be determined with entire accuracy. *Mass. Bonding & Ins. Co. v. Johnston & Harder*, 22 A.2d 709, 713-14 (Pa. 1941). We review a trial court's decision whether to grant a new trial based on alleged excessiveness or inadequacy of the verdict for an abuse of discretion. *Botek v. Mine Safety Appliance Corp.*, 611 A.2d 1174, 1176 (Pa. 1992). Judicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant. *Haines v. Raven Arms*, 640 A.2d 367, 369 (Pa. 1994). The refusal of a remittitur is peculiarly within the discretion of the trial court and will not be reversed absent an abuse of discretion or error of law. *Id.*, *citing Scaife Co. v. Rockwell-Standard Corp.*, 285 A.2d 451, 456-57 (Pa. 1971).

Here, we cannot say the verdict amount was excessive, or that it shocks the conscience, or that it was clearly based on partiality, prejudice or passion. First, PTC clearly minimizes the level, duration and extent of Bailets's non-economic injuries. To the tabulation of harms PTC acknowledges were supported by evidence presented at trial, we add the existence of physical manifestations such as insomnia and weeping. N.T. 5/23/16 at 190-91; 5/25/16 at 533-38. Moreover, PTC's assertion Bailets's emotional state mirrored those of any person who might find himself unemployed quite misses the point that Bailets became unemployed as a result of PTC's intentional

retaliation against him for exposing wrongdoing, a turn-of-events about which Bailets ruminated endlessly, wondering whether he had done the right thing given his resulting dire financial predicament and its impact on his family. This type of emotional upset is not commonplace. In any event, while damages must be based on evidence, that evidence may consist of inferences. A legitimate inference from the evidence presented at trial was the amount of Bailets's non-economic losses in the form of mental anguish (evidenced by worry, fear, guilt, insomnia, and weeping), embarrassment, humiliation, and loss of reputation were commensurate with and equal to the economic damages he suffered. We reiterate we have affirmed the Commonwealth Court's verdict with respect to the amount of economic damages awarded. *Bailets v. Pa. Turnpike Comm'n.*, 168 A.3d 172 (Pa. 2017). As we determine there was no error or abuse of discretion in the court's denial of remittitur, or judgment n.o.v. as to non-economic damages, we now affirm its non-economic damages verdict as well.

Judgment affirmed.

Chief Justice Saylor and Justices Baer, Todd, Donohue, Wecht and Mundy join the opinion.