WAYMOND M. BROWN, Judge
Roxanne Garrison and her employer, Mercy Home Health Berryville (collectively, Mercy), bring this appeal from a judgment entered by the Boone County Circuit Court on a jury's verdict awarding Charles Hodge ("Bill") and Mary Hodge a total of $5.21 million arising out of a collision between a motorcycle and a car.[1] Mercy argues *111 that the circuit court erred in instructing the jury; in permitting counsel for the Hodges to make an improper closing argument; and in denying Mercy's motion for a new trial or remittitur because of excessive damages. We affirm.
The collision occurred at approximately 1:50 p.m. on April 23, 2015. Hodge was riding his motorcycle south on U.S. Highway 65 in Harrison, Arkansas. Garrison was traveling north on Highway 65. As Garrison attempted to make a left turn from Highway 65 onto Kenilworth Drive, she collided with Hodge's motorcycle, striking it on the front and left. Hodge was thrown from his motorcycle, suffering severe personal injuries, including the loss of his left leg above the knee.
Hodge filed suit against both Garrison and Mercy for the injuries he received as a result of the collision. The complaint alleged negligence against Garrison. Specifically, Hodge asserted three theories of negligence: that Garrison failed to yield the right of way; that she failed to maintain control of her vehicle; and that she failed to maintain a proper lookout. The claims against Mercy were premised on vicarious liability because Garrison was alleged to have been acting in the course and scope of her employment with Mercy. The Hodges sought compensatory damages for both property damage to the motorcycle and for personal injuries and loss of consortium.
Garrison and Mercy jointly answered, admitting the collision and that Garrison was acting in the course and scope of her employment but otherwise denying the material allegations of the complaint.
The case was submitted to a jury over five days. The circuit court gave the jury a general-verdict form on the issue of Garrison's negligence. The court also gave the jury separate verdict forms for each element of the Hodges' damages. One of the instructions (AMI Civ. 903) informed the jury that Ark. Code Ann. § 27-51-104(b)(8), which prohibits operating a motor vehicle when the driver is inattentive and such inattention is not reasonable and prudent in maintaining vehicular control, was in effect at the time of the collision between Hodge and Garrison and that violation of that statute was evidence of negligence that the jury could consider. Mercy objected to the circuit court including section 27-51-104(b)(8) in AMI Civ. 903 on the basis that there was no evidence that Garrison was inattentive. The circuit court allowed Hodge's AMI Civ. 903 instruction to be given.
Also over Mercy's objection, the circuit court instructed the jury that one element of damages that Hodge was claiming was for his loss of earning capacity. Mercy objected, claiming that there was no evidence regarding loss of earning capacity. According to the evidence, Hodge made approximately $1,100 more in 2016 than he did in 2014, the year before and after the accident. Mercy specifically argued that there was no qualified expert to tie any disability rating to the loss of ability to earn income. The court overruled Mercy's objection.
The jury found that Garrison was negligent and that such negligence was the proximate cause of the damages suffered by Bill Hodge. The jury also answered the separate verdict forms for each element of the Hodges' damages. They awarded Bill Hodge $1 million for the nature, extent, duration, and permanency of his injuries; $1 million for past and future medical expenses;
*112 $3 million for pain, suffering, and mental anguish; approximately $4,100 for lost earnings; approximately $103,000 for loss of earning capacity; $50,000 for scarring and disfigurement; and $5,500 for the difference in the fair market value of the motorcycle. The jury also awarded $100,000 for Mary Hodge's claim for loss of consortium. The verdict form for Bill Hodge's disfigurement claim was signed only by eight of the twelve jurors; the court awarded $0 for this claim. Thus, with the exception of the disfigurement claim, judgment was entered on the jury's verdict. The total awarded by the judgment was $5,212,455.70.
Mercy filed two posttrial motions-a motion for stay of enforcement of the judgment and approval of a supersedeas bond and a motion for judgment notwithstanding the verdict (JNOV) or, alternatively, a motion for new trial. The JNOV motion raised twenty-one separate issues in its request for a new trial, including that the circuit court erred in instructing the jury on inattentive driving and loss of earning capacity. Mercy also argued that it was entitled to a new trial because the verdict was excessive with respect to the claims for pain, suffering, and mental anguish; the claim for past and future medical expenses; and the claim for loss of earning capacity.
The circuit court granted Mercy's motion for a stay but denied Mercy's JNOV motion. This appeal followed.
On appeal, Mercy contends the circuit court erred by (1) instructing the jury on inattentive driving because there was no evidence that Garrison was driving inattentively; (2) instructing the jury on lost earning capacity because the evidence did not show that Hodge suffered any loss of earning capacity; (3) permitting Hodge's counsel to make an improper closing argument and refusing to grant a new trial to remedy the error; and (4) denying Mercy's motion for a new trial or remittitur because the jury's award of damages was grossly excessive.
Mercy first argues that the circuit court erred in instructing the jury on inattentive driving because there was no evidence that Garrison was driving inattentively. A party is entitled to a jury instruction when it is a correct statement of the law and there is some basis in the evidence to support giving the instruction.[2] It is the duty of the circuit court to instruct the jury, and each party has the right to have the jury instructed on the law of the case with clarity and in such a manner as to leave no grounds for misrepresentation or mistake.[3]
Only where reasonable minds will not differ that the evidence does not establish a basis for a jury instruction is it error for the circuit court to give the instruction.[4] The level of evidence to support the giving of an instruction does not necessarily have to rise to the level of substantial evidence to support the jury's verdict.[5] Under the standard of review in this matter, this court will not reverse a circuit court's decision to submit a jury instruction unless the circuit court abused its discretion.[6]
*113 Mercy points to Roxanne Garrison's testimony that she was not using her cell phone, texting, smoking, or changing the radio station at the time of the collision. Mercy also points to the testimony of Sergeant Chad Morris of the Harrison Police Department that he could not tell that Garrison was distracted. However, in making this argument, Mercy ignores our standard of review. The amount of evidence required to support the giving of an instruction does not necessarily have to rise to the level of substantial evidence to support the jury's verdict.[7] There merely has to be "some basis" in the evidence to support the instruction.[8]
Here, Garrison testified that she did not see or hear Hodge's motorcycle. Our supreme court has described similar testimony as being "inattentive" and evidence of negligence.[9] This is because one may not be heard to say that he did not see what was plain to be seen.[10] There was also testimony from Garrison from which the jury could infer that she was impatient and in a hurry because she had sat, waiting to turn for what she said seemed like "several minutes."[11] Thus, there is "some basis" in the evidence to support the giving of the instruction on inattentive driving.
Mercy's related argument that Garrison's failure to see Hodge's motorcycle cannot be used as evidence to support giving the inattentive-driving instruction because there are separate statutory prohibitions against both failing to maintain a proper lookout and inattentive driving, is not preserved for our review. There was no objection to the giving of the instruction based on its being covered by another instruction. Nor did Mercy raise the issue in its motion for new trial. The failure to object to the giving of an erroneous jury instruction before the case is submitted to the jury constitutes a waiver of any error committed by the court in giving it.[12] Moreover, there is no logical reason why the same evidence cannot support jury instructions on more than one theory.
Mercy makes two related arguments about Hodge's loss-of-earning-capacity claim. The first is that the circuit court erred in instructing the jury on this claim because there was no evidence to support the giving of the instruction. Mercy's second argument is that the jury's award of damages for loss of earning capacity is speculative because there was no evidence to support the jury's verdict on this issue.
The loss of future wages and the loss of ability to earn are two separate and distinct elements of damages.[13] Loss of earning capacity is the permanent diminution of the ability to earn money.[14] The impairment of the capacity to earn is the gravamen of the element.[15] The fact that the plaintiff is earning more than at the *114 time of the injury is a factor to be considered, but does not preclude recovery for loss of earning capacity.[16] Proof of loss of earning capacity does not require the same specificity or detail as does proof of loss of future wages.[17] If there is proof of permanent disability, this element of damages may be submitted to the jury even in the absence of specific evidence of pecuniary loss due to inability to earn in the future.[18] A numerical "impairment rating" is not essential to recovering for loss of earning capacity.[19] In the absence of direct proof of the value of the diminished capabilities, the probable diminution of earning capacity may be inferred from the nature of the injuries.[20]
The loss of a limb permits recovery for loss of earning capacity without the specificity required for loss of future earnings.[21] The loss of earning capacity is also separate and distinct from the permanency of the injury.[22] Here, it is undisputed that Hodge suffered a permanent injury in the loss of his left leg above the knee. Therefore, the instruction as to decreased earning capacity was proper under the circumstances of this case.
Mercy contends that there was no evidence of impairment of earning capacity, and the fact that Hodge's wages were higher after the accident than before proves no impairment-of-earning capacity. In rejecting such an argument, the Pennsylvania Supreme Court said:
The defendants contend that there was no evidence of impairment of earning power and that the fact that Bochar's wages were higher after the accident than before proves no deterioration of earning ability. A tort feasor is not entitled to a reduction in his financial responsibility because, through fortuitous circumstances or unusual application on the part of the injured person, his wages following the accident are as high or even higher than they were prior to the accident. Parity of wages may show lack of impairment of earning power if it confirms other physical data that the injured person has completely recovered from his injuries. Standing alone, however, parity of wages is inconclusive. The office worker who loses a leg has obviously had his earning ability impaired even though he can still sit at a desk and punch a comptometer as vigorously as before. It is not the status of the immediate present which determines capacity for remunerative employment. Where permanent injury is involved, the whole span of life must be considered. Has the economic horizon of the disabled person been shortened because of the injuries sustained as the result of the tort feasor's negligence? That is the test. And it is no answer to that test to say that there are just as many dollars in the patient's pay envelope now as prior to his accident. The normal status of a healthy person is to progress, and to the extent that his progress has been curtailed, he has suffered a loss which is properly computable in damages.[23 ]
*115 Our court has held that the fact the plaintiff is earning the same salary as prior to the accident is merely a factor for the jury to consider and is not conclusive.[24] Here, Hodge suffered the loss of his left leg above the knee. He also testified that he cannot fully perform all the functions of his job as before the accident. Therefore, there was evidence that his ability to earn has been limited.
The closing argument given by Hodge's attorney is challenged in Mercy's third point. Mercy argues that the circuit court abused its discretion in not granting a new trial after permitting an improper argument.
We accord wide discretion to the circuit court in controlling, supervising, and determining the propriety of counsel's closing arguments.[25] We will not reverse a circuit court's ruling regarding a closing argument absent a manifest abuse of discretion.[26] An abuse of discretion occurs when the circuit court acts improvidently or thoughtlessly, without due consideration.[27]
During closing argument, counsel for Hodge was discussing the differences in the testimony and opinions of two accident-reconstruction experts. Counsel then continued:
But the point is, what lane was it in? It was in the lane Bill Hodge had the right to occupy at the time. Instead, the defendants have provided an interesting defense. It's called the, I didn't see it defense. And Mr. Hendren is a very good speaker. He did a very good job in his opening argument. In fact, when I was listening to it I started thinking to myself, I hope we don't buy what he's selling in the, I Don't See It Defense. If we buy that, our streets aren't safe because it would mean anybody that didn't see ...
Mercy objected at that point. At the bench conference, Mercy argued as follows:
Your Honor, I've heard the "I don't do this very much thing," a few times, but he knows better than a Golden Rule Argument. That's exactly what that is. You can't say, "Our streets aren't safe" and say that to a jury. That is absolutely inappropriate. And they ought to be instructed and cautioned that he can't make that kind of an argument because it's a Golden Rule Argument, and it's inappropriate.
Mercy's co-counsel added:
The problem with it is that the issue in this case is Mr. Hodge and Ms. Garrison, not the safety of the community in general. That's inflammatory and prejudicial. And we join the objection and ask for the cautionary instruction.
After counsel for Hodge said that he was finished with that remark but intended to continue to discuss Mercy's defense theory, the court said that it was going to give an "instruction that they can't be asked to put their self in the place of the-I'm not sure that really is a Golden Rule Argument." The court also overruled Mercy's request for an instruction that the jury is not to consider any argument about the safety of the community at large. Mercy then made a motion for a mistrial "because we don't think that the bell can be un-rung especially if the Court's not even going to give them any kind of cautionary instruction or comment about the impropriety *116 of the argument." The request for a mistrial was denied.
Counsel for Hodge then continued his closing argument as follows:
As I said, Mr. Hendren's defense in this case is an, I didn't see it defense. And on that theory, if I caused an accident and I simply could say, "I didn't see it," and I could be excused from responsibility, that's exactly what the defendants are asking. That's what Ms. Garrison is asking and that's what the effect would be on the company that employed her, if that defense was found to be acceptable.
I could go to an intersection and one of the things they've talked about is maybe she didn't see the motorcycle because there was a white car behind it and that somehow that obscured the silhouette of the motorcycle. On that theory I could be at an intersection with a red truck, a bright red truck with a child walking across in a red coat and claim that I didn't see the child in the red coat because it was obscured, the child was obscured by the background. That defense is simply not acceptable.
Although Mercy did not object to this portion of the argument, it contends on appeal that it, too, was improper.
We hold that the issue is not preserved for our review because Mercy's objection at trial was based on a "Golden Rule" argument and the argument on appeal is based on a "send-a-message" closing argument.
There is a distinction between a "Golden Rule" argument and a "send-a-message" argument.[28] A "Golden Rule" argument is one that implores the members of the jury to put themselves in the position of a party or victim.[29] The circuit court indicated that Hodge was not making a "Golden Rule" argument, but Mercy did not expand its objection to explicitly make a "send-a-message" objection. A party cannot change the grounds for an objection or motion on appeal but is bound by the scope and nature of the arguments made at trial.[30] Also, the court never ruled on the "send-a-message" issue because Mercy never properly raised a "send-a-message" objection. We are, therefore, precluded from reviewing the issue.[31]
For its fourth point, Mercy contends that the circuit court abused its discretion in denying Mercy's motion for new trial or remittitur because the jury's award of damages was grossly excessive. Mercy argues that the awards for pain and suffering and for past and future medical expenses are excessive.
Juries have wide discretion in awarding damages in personal-injury cases.[32] Where an award of damages is alleged to be excessive, we review the proof and all reasonable inferences most favorably to the appellee and determine whether the verdict is so great as to shock the conscience of the court or demonstrate passion or prejudice on the part of the trier of fact.[33] "In determining whether the amount was so great as to shock the conscience, we consider such elements of damage as past and future medical expenses, *117 permanent injury, loss of earning capacity, scars resulting in disfigurement, and pain, suffering, and mental anguish."[34]
Mercy first argues that the jury's award of $3 million for pain, suffering, and mental anguish is excessive and not supported by the evidence. Specifically, Mercy argues that the testimony from Hodge and from Dr. Ted Lennard, who examined Hodge and reviewed the medical records, indicates that Hodge had minimal or no pain and that Hodge had no signs of anxiety or depression. Mercy also relies on Hodge's testimony that he could not recall any excruciating pain. Mercy's argument is somewhat misleading in that it frames the award and argument in terms of being an award only for future pain, suffering, and mental anguish. However, the jury was instructed to consider both past and future pain, suffering, and mental anguish.
There is no definite and satisfactory rule to measure compensation for pain and suffering and the amount of damages must depend on the circumstances of each particular case.[35] Mercy argues that the fact that Hodge's leg was amputated above the knee cannot be considered as supporting an award for pain and suffering because it is, according to Mercy, covered under the award for nature, extent, duration, and permanency of the injury. However, Mercy cites no authority for this proposition. Moreover, pain and suffering may be inferred from the serious nature of the injury.[36] In Scott-Burr Stores Corp. , our supreme court said that "many of the questions sometimes asked witnesses and answers given in regard to ... loss of limbs as to pain and suffering, are unnecessary attempts at proof of facts known by everyone who understands the extent of injuries."[37]
Here, there is no doubt that Hodge suffered a severe, traumatic injury that resulted in the loss of his left leg above the knee. Hodge's mother, Rosemary Hodge, testified that before his second surgery, Hodge was yelling out in tremendous pain while not quite fully awake. Hodge himself also testified that there was some pain while he was in the hospital. Hodge will periodically have to have his prosthesis changed. This will also require additional physical-therapy sessions. This need for future procedures, while not surgeries, will also support an award for pain and suffering.[38] There was also testimony that Hodge can no longer do several of the activities that he formerly enjoyed. These changes in lifestyle will also support an award for pain and suffering.[39]
As noted above, we also consider other elements of damages in assessing whether an award is excessive.[40] Here, the jury awarded $1 million for past and future medical expenses and $1 million for the nature, extent, duration, and permanency of the injury. Thus, the jury's award of $3 million for pain, suffering, and mental anguish is not out of line with the other elements of damages awarded by the jury. We cannot say that the jury's award shocks the conscience of the court.
*118 Finally, Mercy contends that the jury's verdict of $1 million for past and future medical expenses is excessive. We disagree.
There was testimony from Dr. Ted Lennard that Hodge's total past medical expenses, including the initial cost of the prosthesis, was approximately $379,000. The initial cost of the prosthesis was $99,608. There was also testimony that the prosthesis would need to be replaced every three to five years. It was suggested that Hodge have the replacement every three years so he could keep as active as possible. The cost of each replacement was approximately $63,300. There is also the issue of maintenance, repair, and alteration of the prosthesis between replacements. This was estimated at $6,300 per year. Cycle Gates, the prosthetist, estimated the total cost of future medical expenses relating to the prosthesis for the remainder of Hodge's life at $822,812.
During closing arguments, Hodge's attorney asked the jury to award $970,609.75 for Hodge's past and future medical expenses.[41] Mercy argues that any award above that total is excessive, not supported by the evidence, and speculative. Mercy's argument ignores the fact that future medical expenses do not have to be proved with the same exactness as past medical expenses.[42] Moreover, Dr. Lennard also pointed out that Hodge will have additional expenses for physical therapy every time the prothesis is replaced. These extra sessions do not appear to have been factored into the estimate. As noted above, the jury awarded $1 million for past and future medical expenses. These extra sessions could easily push the medical expenses past the $1 million the jury awarded.
Affirmed.
Abramson and Harrison, JJ., agree.

Mary Hodge's consortium and companionship claims are derivative of her husband's claims. Therefore, for convenience, we will refer to Bill Hodge in the singular unless the context requires otherwise.

Engleman v. McCullough , 2017 Ark. App, 613, 535 S.W.3d 643.

McCorkle Farms, Inc. v. Thompson , 79 Ark. App. 150, 84 S.W.3d 884 (2002).

Pettus v. McDonald , 343 Ark. 507, 512, 36 S.W.3d 745, 748-49 (2001).

See id. at 512-13, 36 S.W.3d at 749.

Nelson v. Stubblefield , 2009 Ark. 256, 308 S.W.3d 586.

Pettus , 343 Ark. at 512-13, 36 S.W.3d at 748-49.

Id.

See Bell v. Darwin , 327 Ark. 298, 937 S.W.2d 665 (1997) ; Ball v. Hail , 196 Ark. 491, 118 S.W.2d 668 (1938).

Ball , 196 Ark. at 496, 118 S.W.2d at 671 ; see also Cobb v. Atkins , 239 Ark. 151, 388 S.W.2d 8 (1965).

See Bell, supra.

Thy N. Tran v. Thi T. Vo , 2017 Ark. App. 618, 535 S.W.3d 295.

Cates v. Brown , 278 Ark. 242, 645 S.W.2d 658 (1983).

Gross & Janes Co. v. Brooks , 2012 Ark. App. 702, 425 S.W.3d 795.

Id. ; see also Henry Woods, Earnings and Earning Capacity as Elements of Danger in Personal Injury Litigation , 18 Ark. L. Rev. 304 (1964).

Brooks, supra .

Id.

Id.

Id.

Id.

Hergeth, Inc. v. Green , 293 Ark. 119, 733 S.W.2d 409 (1987).

Id.

Bochar v. J.B. Martin Motors, Inc. , 374 Pa. 240, 97 A.2d 813, 815 (1953) (footnote omitted).

Brooks, supra .

Nat'l Bank of Commerce v. Quirk , 323 Ark. 769, 918 S.W.2d 138 (1996).

Id.

Milner v. Luttrell , 2011 Ark. App. 297, 384 S.W.3d 1.

Lee v. State , 340 Ark. 504, 11 S.W.3d 553 (2000).

Id.

Norman v. Cooper , 101 Ark. App. 446, 449-50, 278 S.W.3d 569, 572 (2008).

TEMCO Constr., LLC v. Gann , 2013 Ark. 202, 427 S.W.3d 651.

Buckley v. Summerville , 2018 Ark. App. 100, 543 S.W.3d 534.

Id.

Id. at 8, 543 S.W.3d at 540 (quoting Bill Davis Trucking, Inc. v. Prysock , 301 Ark. 387, 391, 784 S.W.2d 755, 757 (1990) ).

Hamby v. Haskins , 275 Ark. 385, 390, 630 S.W.2d 37, 40 (1982).

Scott-Burr Stores Corp. v. Foster , 197 Ark. 232, 122 S.W.2d 165 (1938).

Id. at 242, 122 S.W.2d at 170.

See RLI Ins. Co. v. Coe , 306 Ark. 337, 813 S.W.2d 783 (1991).

Id.

Buckley, supra .

Hodge's expert, Dr. Ralph Scott, an economist, reduced the future cost of the prosthesis replacements to a present value of $591,613. It was this present-value figure that Hodge's attorney used during closing argument to add to the past medical expense of approximately $379,000 to arrive at the $970,609.75 figure Mercy's argument refers to.

Brooks, supra .